# EXHIBIT 1

STATE OF MICHIGAN

IN THE 14TH CIRCUIT COURT

* * * * *

KEVIN MARK WIGGER,
          Plaintiff,

v

GEORGE ROBERT WIGGER
          Defendant,
_____/

HON. TIMOTHY G. HICKS

File No. 14-49481-CZ

Kevin Mark Wigger, #581201
Pro Per
Central Michigan Correctional Facility
320 North Hubbard
St. Louis, MI 48880

SIVER & ASSOCIATES, PLLC
Thomas D. Siver (P69751)
James A. Siver (P33597)
Attorneys for Defendants
1575 Forty-Fourth St., SW
Grand Rapids, MI 49509
616-261-5800

_____/

## OPINION AND ORDER AFTER BENCH TRIAL

### INTRODUCTION

This bench trial started on June 24, continued to June 25, resumed on June 30, and on then concluded on July 9. The court's findings of fact are embodied in the narrative outline below. Its conclusions of law follow. The court will generally continue its practice of using the parties' first names.

On July 15, Kevin telephoned court staff, indicating the bank records were finally received from his subpoena signed during trial. He indicated the amounts were substantial, and requested guidance on how to deliver that information to the court. Judge Hicks's assistant indicated she could not give legal advice, but that all documents needed to be filed at Circuit Court Records for them to be considered by the court.

Exhibit E

Case:16-80049-jwb Doc #:143-1 Filed: 06/08/18 Page 3 of 18
Case:16-80049-jwb Doc #:120-2 Filed: 05/18/17 Page 2 of 100
Case:15-06752-jwb Doc #:15-2 Filed: 02/22/16 Page 2 of 17

## PRELIMINARY MATTERS

The court never granted a motion to adjourn, but the court believes that this schedule allowed the parties ample time to resolve subpoena issues (plaintiff) and defendant's concerns about plaintiff's undisclosed ("trial by ambush") exhibits.

Kevin conducted a heinous crime and was sentenced to a long term in the Michigan Department of Corrections. It also appears that he has engaged in some nefarious acts relating to his victim. None of these things are laudable, but they are generally irrelevant to the legal issues which must be decided here.

Fulfilling the court's obligations to provide Kevin "reasonable access" to justice has been a dominant theme in the case. The record has been established and it will generally repose as it is, rightly or wrongly. The court believes that the way it handled Kevin's subpoena issues fulfilled its obligations to him, especially with the intervals in the trial schedule allowing him some more time. The court also believes that, generally, the non-appearing witnesses would not have added much to the case. Some of these witnesses ran the risk of enmeshing the trial in less relevant and more emotional matters, especially as it related to his plaintiff's former spouse, now known as Ada Young.

But it must also be noted that the court refrained from interposing its own objections (plaintiff did not object) to the great many leading questions defense counsel asked his client, especially on July 9. Counsel virtually testified at times.

Finally, Kevin represented himself well. He researched all the salient issues prior to trial, and conducted his direct examinations with minimal assistance. His decision to represent himself has hindered him at certain points. A skilled attorney might have done better with the subpoena issue and in other places.

Case:16-80049-jwb   Doc #:143-1   Filed: 06/08/18   Page 4 of 18
Case:16-80049-jwb   Doc #:120-2   Filed: 05/18/17   Page 3 of 100
Case:15-06752-jwb   Doc #:15-2   Filed: 02/22/16   Page 3 of 17

## FACTS

The court's findings start with this chart showing the "major" events in the case:

| Date | Kevin's Status | Status of House on Third Street | Money Matters |
|---|---|---|---|
| 2003 (there is conflicting testimony about which month) | | Third St house was purchased. Kevin purchased it as a "starter house" for George. | George and Alisa discharged their rent obligations by paying the mortgage to the bank. |
| 04/02/06 | Kevin is lodged in the Muskegon County Jail. | George and Lisa rented the house since spring of '03. | |
| 06/09/06 | Incarcerated in the county jail, and executes a durable power of attorney for George. | George says he performed a lot of work on the house in 2005-2006. | Creates George's access to accounts. The power of attorney does not limit George's authority to any particular accounts. |
| 08/19/06 | Kevin executes the judgment of divorce from his wife, Ada. He is also sentenced by Judge Graves to a prison term in the Michigan Department of Corrections | The judgment of divorce (page 5) gives George $15,000 after "payment of the underlying mortgage, closing costs, and realtor fees..." Kevin (exhibit 5Y, April, 2006) thought the house was worth "$135-150" | The judgment of divorce (page 5) gives George $15,000 after "payment of the underlying mortgage, closing costs, and realtor fees..." |
| 09/05/06 | Kevin is incarcerated in the MDOC. | George conveys the house to himself and Ada. The deed was never produced. Exhibit 14 suggests that it conveyed a life estate. | |
| Dec. '06 | | | The IRA account in question here is officially established. George withdraws $5,500 |
| 04/02/07 | | | |
| 06/25/07 | | House sold to Cadwell on land contract. The arrangement lasted only a few months. | |
| July '07 | | No one in the Wigger family ever lived there again. | George and Alisa purchase the Carr Road house for $86,000. They made no down payment. |
| 08/10/07 | | Shaded to show Third Street house now essentially gone, for purposes of this case. | George withdraws $2,000 |

Case:16-80049-jwb    Doc #:143-1    Filed: 06/08/18    Page 5 of 18
Case:16-80049-jwb    Doc #:120-2    Filed: 05/18/17    Page 4 of 100
Case:15-06752-jwb    Doc #:15-2    Filed: 02/22/16    Page 4 of 17

| Date | Kevin's Status | Status of House on Third Street | Money Matters |
|---|---|---|---|
|  |  |  | George withdraws $3,000 |
| 08/17/07 |  |  | George withdraws $6,500 |
| 03/04/08 |  |  | George withdraws $715 |
| 08/20/08 |  |  | George withdraws $6,500 |
| 10/18/08 |  |  | George withdraws $3,000 |
| 04/09/09 |  |  | George withdraws $1,000 |
| 05/14/09 |  |  | George withdraws $2,500 |
| 06/18/09 |  |  | George withdraws $3,000 |
| 07/27/09 |  |  | George withdraws $3,500 |
| 11/16/09 |  |  | George withdraws $3,500 |
| 11/20/09 |  |  |  |
| 02/19/10 |  | Sheriff's Deed after foreclosure proceedings. Sale pursuant to foreclosure (exhibit 15); Kevin testified at trial that it sold for $35,000 |  |
|  |  |  | George withdraws $4,500 |
| 02/22/10 |  |  | George withdraws $3,000 |
| 03/30/10 |  |  | George withdraws $2,985 |
| 08/12/10 |  |  |  |
| 10/27/10 |  | Covenant deed from Fifth Third Bank to Shawn Arvey |  |

In addition to these sums, George received some other sums. He testified that he, pursuant to the Durable Power of Attorney ("DPOA"), withdrew approximately $36,000 to pay to his mom "and kept $7,500" to pay the taxes. He said that that withdrawal "had nothing to do" with the withdrawals shown on Appendix A.

George conceded that not all the withdrawals were spent on the house. He said his father told him he could borrow some money, and he did. He says he had a phone conversation with Kevin when he was at Jackson. He says he and Kevin agreed that George could borrow some money and make payments to Kevin. This is supported by the notation in Kevin's letter, exhibit A, where he seems to authorize the disbursements but tells George to keep records of them.

Case:16-80049-jwb   Doc #:143-1   Filed: 06/08/18   Page 6 of 18
Case:16-80049-jwb   Doc #:120-2   Filed: 05/18/17   Page 5 of 100
Case:15-06752-jwb   Doc #:15-2   Filed: 02/22/16   Page 5 of 17

## ANALYSIS

Both Kevin and George, to their credit, were honest about things that were generally against their interest. Kevin admitted to all of the bad acts described above, and George admitted to withdrawing $51,200 from the account, as evidenced in exhibit 10 and summarized in Appendix A.

### Consideration of the Complaint

The only remaining count in the fourth amended complaint is titled "fraudulent conversion." However, paragraph 15, contained in it, also cites MCL 600.2919a. Kevin also argues, at several points in his complaint, that George embezzled this money, but he has not asserted a count titled embezzlement.

Two decisions of the United States Supreme Court[1] mandate that courts liberally construe pro se complaints. The *Estelle* Court, quoting the unanimous holding in *Haines*, stated "a pro se complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers'" as guidance for future courts. *Estelle*, supra, at 106, quoting *Haines v Kerner*, 404 US 519. "[A] prisoner's pro se pleadings are held to a less stringent standard in determining whether there has been a violation warranting sanctions." *People v Herrera*, 204 Mich App 333, 339; 514 NW2d 543, 546 (1994). Forty-three Michigan cases have cited or referenced *Estelle*, but most are unpublished. The published cases largely concern *Estelle*'s "deliberate indifference" analysis.[2]

---

[1] *Estelle v Gamble*, 429 US 97, 106; 97 S Ct 285, 292; 50 L Ed 2d 251, 261 (1976) and *Haines v Kerner*, 404 US 519, 520; 92 S Ct 594; 30 L Ed 2d 652 (1972).
[2] See, generally *Jackson v City of Detroit*, 449 Mich 420, 430; 537 NW2d 151, 156 (1995); *York v Detroit*, 438 Mich 744, 757; 475 NW2d 346, 352 (1991); and *Rushing v Wayne County*, 436 Mich 247, 275; 462 NW2d 23, 35 (1990).

Case:16-80049-jwb   Doc #:143-1   Filed: 06/08/18   Page 7 of 18
Case:16-80049-jwb   Doc #:120-2   Filed: 05/18/17   Page 6 of 100
Case:15-06752-jwb   Doc #:15-2   Filed: 02/22/16   Page 6 of 17

Few Michigan cases provide guidance regarding liberal construction for pro se documents. Those that do so blend *Haines* and *Estelle*. "Pleadings offered in propria persona should be liberally construed in the interests of justice." *Montgomery v Robey*, unpublished opinion per curiam of the Court of Appeals, issued May 6, 2010 (Docket No. 290927), p 7.

The court would overstep its authority if it added a count (i.e. embezzlement) to Kevin's case that did not officially exist. However it is obligated to liberally construe this pro se complaint, pursuant to the cases cited above. Thus, the statutory conversion claim is part of the count I and the court will consider it.

That statute, MCL 600.2919a, says:

> (1) A person damaged as a result of either or both of the following may recover three times the amount of actual damages sustained, plus costs, and reasonable attorney fees: (a) Another person's stealing or embezzling property or converting property to the other person's own use.

The very recent case of *Aroma Wines and Equipment, Inc. v Columbian Distrib Servs, Inc.* ___ Mich ___; ___ NW2d ___ (2015) (Docket Nos. 148907 & 148909) greatly assists the court's analysis. Since the DPOA provided George with access to these funds, any conversion or embezzlement must be considered in that context.

## The Durable Power of Attorney- Fundamentals

Defense counsel wrangled extensively with plaintiff on June 30 about the DPOA's meaning. George's position, as reflected in the trial questioning and argued in his motion for directed verdict on July 9, is simply wrong and misunderstands the law. Everyone agrees that the DPOA provides George with *access* to these funds, but the DPOA is not a gift to George. He has to manage them "for (Kevin's) use and benefit." (exhibit 2, first paragraph).

Case:16-80049-jwb   Doc #:143-1   Filed: 06/08/18   Page 8 of 18
Case:16-80049-jwb   Doc #:120-2   Filed: 05/18/17   Page 7 of 100
Case:15-06752-jwb   Doc #:15-2   Filed: 02/22/16   Page 7 of 17

This is a fundamental principle of law. See MCL 700.5501 *et seq*, which Kevin referenced at trial. In *Vander Wall v Midkiff*, 166 Mich App 668, 677-78, 421 NW2d 263, 267 (1988), the court summarized duties inherent in powers of attorney.

> It is well established, though, that powers of attorney are to be construed in accordance with the principles governing the law of agency. One of those principles is that a person who undertakes to act as agent for another may not pervert his powers to his own personal ends and purposes without the consent of the principal after a full disclosure of the details of the transaction.

George *is a fiduciary* with the ability to access the money and property, but for Kevin's benefit. It is not George's money. Providing access to it is not the same as giving it away.

To his credit, George admitted the withdrawals in question. Much of the case turns on the instructions Kevin gave George about how to manage the money and other items identified in the DPOA.

### Kevin's Instructions

Exhibit 5, a lengthy series of letters written by Kevin, many of them replicated in defendant's A-F, is most helpful. It is important at times, though, to distinguish those written before the Judgment of Divorce from those written later.

Kevin and Ada agreed, in the judgment of divorce, to pay George $15,000 when the house was sold. The judgment of divorce characterized this as a loan. Kevin agreed, at trial, that George had earned the $15,000. However, the court has not seen or heard any evidence that George could simply take the $15,000 from Kevin as a sort of "Plan B" if the money was not realized through a sale of the house.

In exhibit A, undated but created in about April 2006, according to Kevin, he gives George permission to borrow money, but asks him to keep track of it.

Case:16-80049-jwb Doc #:143-1 Filed: 06/08/18 Page 9 of 18
Case:16-80049-jwb Doc #:120-2 Filed: 05/18/17 Page 8 of 100
Case:15-06752-jwb Doc #:15-2 Filed: 02/22/16 Page 8 of 17

Exhibit B, also written in about April of 2006, before Kevin's criminal sentence and before the Judgment of Divorce, Kevin tells George "[i]f your house sells, I will make sure you get your share for all the work you have done." The house never sold as contemplated, and George testified that he did not receive this money.

On page 5 of exhibit C, Kevin says "we have to find a way to make it work or just use some of the **pension money** anyway. . ." (emphasis added) This is significant. Kevin was precise in the way he described the money. He had a pension account and the "IRA rollover account" from which George withdrew money.

Exhibit D, written October 2, 2006, registers continuing concern about the taxes and the roof on the house. Kevin says "We need to make sure that once everything is caught up that you can then maintain it."

Kevin said, in exhibit E, dated December 1, 2006, but at about the time the IRA money was received, that he was *giving* George and Alisa $7,500. Kevin conceded, on July 9, that the $7,500 was fair value for George's work as both Kevin's agent and his assistance in dealing with the great many requests/errands that Kevin made of him.

Kevin said that he limited the amounts and sources of the monies he authorized George to access to one account- the so-called IRA rollover account. However, the DPOA contains no such limitation. He said he never orally gave George permission to access his IRA account, which was the source of the $51,200 George withdrew.

Many of Kevin's instructions were ambiguous. On exhibit 5R, he tells George to "use any of my stuff you want, especially if it helps you make money."

Kevin made requests and authorized expenditures for things that could never have been fulfilled from the $2,000 received from Modular (the total is derived from his last paycheck and the sale of his tools) and the personal property (trucks, etc.) that he

Case:16-80049-jwb Doc #:143-1 Filed: 06/08/18 Page 10 of 18
Case:16-80049-jwb Doc #:120-2 Filed: 05/18/17 Page 9 of 100
Case:15-06752-jwb Doc #:15-2 Filed: 02/22/16 Page 9 of 17

said George sold. For example, in the October 2, 2006, letter (exhibit 5Q) Kevin told George to visit him in prison so they could work out a plan (1) get the taxes paid and (2) the roof fixed. This is important because he had conceded that George was *already owed* approximately 15,000 for his previous work, but the roof, as of October 2, 2006, still needed to be completed.

On exhibit 5K, he asked George to (3) send him $50 monthly, (4) to order a typewriter, and talked about getting his TV and radio. On exhibit 5O, he asked him to get a (5) get a dictionary, (6) order USA today and asked him to check on his appeal papers.

He tells him (exhibit 5Y, April, 2006) to "weigh (sic) out weather (sic) to pant (sic) or side the house." On exhibit 5Z (October, 2006), he tells George to use his Sears and Menards credit cards "to pay the taxes and get what you need for the roof." On exhibit 5H, (November 20, 2006) he told George "to go ahead and take money out of the pension account..." but not from the Modular check.

## Analysis of George's Withdrawals

As trial evolved, exhibits 27 and 27a became critical. It is George's list of the work he performed on the Third Street house, and the charges he incurred for those. He said he performed all the work himself- none of it was delegated to any contractors. He also testified that it was the **only** such list he had ever prepared, despite his father's request in exhibit B, that he do so. Even then, exhibit 27 is not a report to his principal (his father), but to his own attorney. In other words, George **never** reported, to his father, in a comprehensive tally, the sums he spent on the house.

Kevin testified the numbers appeared generally correct if the work was performed by a contractor. But he also said that none of the work had actually been performed.

Case:16-80049-jwb   Doc #:143-1   Filed: 06/08/18   Page 11 of 18
Case:16-80049-jwb   Doc #:120-2   Filed: 05/18/17   Page 10 of 100
Case:15-06752-jwb   Doc #:15-2   Filed: 02/22/16   Page 10 of 17

This is a fundamental dispute requiring resolution since the court cannot reconcile the parties' testimonies.

The court finds that George embezzled or converted certain of the sums entrusted to him. The court's reasoning and findings follow:

1. The shaky explanation about the $14,500 loan.

George admitted "borrowing" $14,500 from his dad in July of 2007. The phrasing of that letter in no way connected it to the $15,000 he did not receive in the judgment of divorce, or to amounts he had invested into the Third Street property. He said:

> I want to say sorry I borowed (sic) 14,500 from you in July of '07 to get my house. I didn't want to say anything. I didn't want you to get mad. I am going to pay you back when I get enuff (sic) equity in my house. I didn't realy (sic) have a choice. I needed to get a house. I was not going to buy that house from mom for 126,000. I had to pay some debt and put some on the house again I am sorry I pulled my power of attorney so I cant (sic) toch (sic) that moneny (sic).

Later in the letter he also indicates that he is going to withdraw his profit sharing and split it in half, one account for him and another for his dad.

The thrust of this letter, which has been a central piece of evidence throughout the case, is that George took the money, knew it was wrong, and promised to make it right. And it also coincides with the time he and Alisa purchased their home on Carr Road. George testified that that happened in July of 2007.

George's explanation for this, at trial, may not have helped. He said that he did admittedly borrow the money, that he was in financial stress, and that he was ashamed of it. The "bottom line" is that he still took the $14,500. It must be stressed that this is not a reimbursement of the $15,000 identified in the judgment of divorce.

Finally, as to this point, the $14,500 does not track evenly with the list of withdrawals in Appendix A. George said (testimony illustrated on exhibit H) that he

Case:16-80049-jwb   Doc #:143-1   Filed: 06/08/18   Page 12 of 18
Case:16-80049-jwb   Doc #:120-2   Filed: 05/18/17   Page 11 of 100
Case:15-06752-jwb   Doc #:15-2   Filed: 02/22/16   Page 11 of 17

withdrew the money in three withdrawals, April 2, August 17, both in 2007, and then again in March of 2008. They total, $15,000, not $14,500. The latest was well after George purchased the Carr Road house, and why would he "borrow" the money by "skipping" the August 10, 2007 withdrawal, which apparently was applied elsewhere?

2. George's numbers simply do not add[3] up.

- George testified that, when the IRA account was established in late 2006, he gave his mom $36,000, paid attorney Wasiura $5,500, and gave himself and Alisa $7,500. He also testified that the $7,500 withdrawal had "nothing to do" with the $51,200 in question here. The point is this. The judgment of divorce (page 6) said that account contained approximately $36,000. According to George's testimony, the account contained approximately $13,000 more than that, split between attorney Wasiura and himself.

- Exhibit 27A says that George spent $31,575 on repairs to the house. No combination of withdrawals supports that number.

  George's testimony about this point, on the morning of July 9, was weak. He said that he used $5,000 of a tax refund totaling $7,000-$8,000. He says he charged $5,500 on his PNC credit card. He testified that he charged $1,800 on his Menards credit card. These three amounts total $12,300 and leave approximately $19,000 (of the approximately $31,000 he spent on the house) unexplained.

  After the lunch break, George returned to the witness stand with exhibit K. He claims that he saved approximately $21,500 from his income in 2005-06, and invested that into the house.

  On exhibit K, George said he made a "gross" of $34,840 in 2005, plus overtime and side jobs for which he was paid "under the table." He testified that he made $17,420 in 2006, augmented by those same additional sums. He agreed that he was making monthly mortgage/rent payments of $526, plus paying for the usual car insurance, electrical and utility bills. He testified at one point that he was under financial stress, and that he used some of these sums to repair his credit. His son, Eli, was born on June 1, 2005; Cole was born in 2007.

  It is simply unbelievable to accept that, with these obligations, and this income, that George was able to apply savings of $10,000 in 2005, $3,500 in 2006, and his entire severance pay of $8,000 in 2006, to this project.

- Even when George *finally* produced receipts (defendant's exhibit L), the numbers were still wrong and included duplicate receipts.

- George apparently told his attorney that he had deposited $13,500 into his dad's commissary account. Exhibit 27 contains a request to George from his attorney to "detail out the money approximately $13,500 in commissary deposits." Appendix A shows the actual amounts, from June of 2009 to June of 2013, as $1025.

---

[3] Near the close of trial, defense counsel placed numbers on the board to the right of the bench. Most of those numbers were accurately added, but relied upon assumptions and premises that were either plainly wrong or have not been established.

Case:16-80049-jwb   Doc #:143-1   Filed: 06/08/18   Page 13 of 18
Case:16-80049-jwb   Doc #:120-2   Filed: 05/18/17   Page 12 of 100
Case:15-06752-jwb   Doc #:15-2    Filed: 02/22/16   Page 12 of 17

3. <u>Circumstantial evidence supports the claim that few or none of the repairs indicated in exhibit 27A occurred as George said they did.</u>

- Exhibit 31 is a building permit granted to Shawn Arvey, the purchaser of the property after the foreclosure. He secured a permit to "tear off and reroof back half of roof." This is approximately four to five years after George said he already did that.
- George says that Kevin told him to get money from this account to pay the repairs, but the earliest withdrawal in question was April of 2007, *after* virtually all of the alleged repairs were completed.
- The court asked George where he came up with $32,000 over that time period. He testified, on June 3, that he put them on his own credit cards. He did this despite the fact that his father had told him that he could use Kevin's Sears and Menards credit cards (exhibit F, October 2006) to do these things.
- George testified that he regularly updated his father about the status of the repairs and even sent pictures. Kevin wrote lengthy, detailed, candid letters. Defendant's exhibits A-D and F are a series of letters from April 2006 through October 2006. There is no comment, anywhere, about details of the repairs undertaken. Similarly, George testified that there was never a moment when he came to his father to announce that the job "had been done, was complete, or that he was glad to be done with the work."

4. <u>Common sense supports this conclusion.</u>

George's testimony that, between 2005 and 2006, he invested all his money into the home makes no sense where he had access to his father's money and to credit cards. It also merits mention that he and Alisa promptly took $7,500 from the account in or about December 2006, shortly after Kevin authorized same. Even if George invested all his personal money, why would the same couple wait and "dribble" out their other recoupments, in a series of withdrawals, from April 2, 2007 and then extending into the next three years, instead of taking it when the expense was incurred?

5. <u>George has failed, repeatedly, to produce evidence which would have supported his claims.</u>

His mother could probably testify about the value of the pension which apparently funded the $7,500 in 2006, but she did not testify, even though she and George are currently on good terms. He presents no documents evidencing charges, other than

Case:16-80049-jwb   Doc #:143-1   Filed: 06/08/18   Page 14 of 18
Case:16-80049-jwb   Doc #:120-2   Filed: 05/18/17   Page 13 of 100
Case:15-06752-jwb   Doc #:15-2   Filed: 02/22/16   Page 13 of 17

the $3,518.21 in exhibit L. He presents no building permits secured for performing those repairs. His wife did not testify about his work on the house.

6. <u>George's inconsistent and implausible testimony on several topics badly damaged his credibility.</u>

The sources of the money funding the alleged repairs were the most prominent. In the first day or so of trial, he said he charged virtually all of it. By the last day, he said that he used his savings and income tax refunds. In addition:

- George testified that he withdrew $715 to accommodate his father's request for a typewriter and other incidentals in 2008. However, Kevin had the typewriter in 2006, two years earlier.
- George's handling of the commissary account also belies his position. He apparently (exhibit 27) told his attorney that he deposited $13,500. At trial, he testified that he placed $5200 into Kevin's commissary account. The actual total was far lower than that, and the timing of the deposits he made into the commissary account bears no relationship to the timing of the IRA withdrawals he made.

    Admittedly, the commissary account information (exhibits 21 and 21A), despite its title, only provides detailed information from 2009 forward. However, that provides three years through which to measure coincidence between IRA withdrawals and commissary deposits. This is a representative sample of time.
- George testified, on the first day of trial, that "the rest" of the $7,500 withdrawal was used to pay the taxes. However, he testified later that he only made 2 payments on the taxes- $780.29 and $377.09.
- George told his father that he borrowed $14,500 "to get my house." But he also testified that he made no down payment on the Carr Road house.

## CONCLUSIONS

A common defense theme, both in testimony and in argument, was that George "never expected it to come to this." That is probably correct, but not for the reason counsel says—ostensibly that the family bonds would prevent this situation.

There are several plausible explanations[4] for George's conversion of the money entrusted to him. The first is that he may have had a fundamental misunderstanding, as

---

[4] The court will discuss this more fully in the treble damage discussion which follows.

Case:16-80049-jwb   Doc #:143-1   Filed: 06/08/18   Page 15 of 18
Case:16-80049-jwb   Doc #:120-2   Filed: 05/18/17   Page 14 of 100
Case:15-06752-jwb   Doc #:15-2   Filed: 02/22/16   Page 14 of 17

his counsel seemed to have, about what the DPOA allowed him to do. Simply, the DPOA was not a gift to him.

Most people who misuse others' money, in this judge's experience, start with a fairly innocuous withdrawal and some intent to pay that money back. (Kevin's various communications may have created some of this.) However, when the first withdrawal is not detected, it becomes easier to do it a second, third, or fourth time. Perhaps the temptation here was simply too much for George. He admitted he was under financial pressure for much of this time.

He also seemingly presumed or gambled that his father would not respond as he has. Kevin is not a sympathetic figure, with his criminal past and motivation to keep his money situation hidden [5] from federal and state authorities. However, these are choices George made, and he has lost that gamble.

Finally, it merits emphasis that he and his attorney admitted, at one point, that George owed at least $14,500 on the loan that was never repaid. In the end, they admitted George owed $5,267.62 to his dad.

The court believes that George is entitled to recover the $15,000 from his father. Kevin promised (in a pre-divorce letter) that he would make sure that George was paid for his work. He has agreed that George's work was worth approximately $15,000. Ada is a beneficiary of this decision, because the judgment of divorce said the money was to come from the sale of the proceeds of the house on Third Street. However, the court also overlooks this because of the ambiguous and mixed messages Kevin sent to George at various times. In the end, and considering some of the interests of equity, the court believes George is entitled to that $15,000.

---

[5] On July 14, the court received a package of documents from the attorney general attempting to seize plaintiff's money.

Page 14 of 17

Case:16-80049-jwb    Doc #:143-1    Filed: 06/08/18    Page 16 of 18
Case:16-80049-jwb    Doc #:120-2    Filed: 05/18/17    Page 15 of 100
Case:15-06752-jwb    Doc #:15-2    Filed: 02/22/16    Page 15 of 17

Kevin testified that George also converted monies from his last paycheck (approximately $1,200) and his former employer's purchase of his tools ($700). George gave conflicting testimony on that point, but the court believes his testimony on the first day was most accurate. He admitted then that he had received those sums.

In the end, the court assesses Kevin's damages as follows:

| | |
|---|---:|
| Amount George admitted he withdrew (Appendix A) | $51,200 |
| Last paycheck and tool money | 2,000 |
| Less amount Kevin agrees George's work was worth | (15,000) |
| | $38,200 |

There are some other matters discussed in this case where the proofs are simply insufficient for the court to enter any judgment. For example, this litigation now exposes, to creditors, including the state of Michigan, assets that *might have* remained protected within the IRA. This may be true, but Kevin presents no evidence about that from which the court could agree or calculate a number for any judgment. This is another area where an attorney could have helped.

In his closing argument, Kevin asked for a raft of things (pre-judgment interest, specific orders governing the manner in which any judgment would be enforced, appointing his sister as a receiver, etc.) The court declines to award any of those.

Kevin also claims that he may be subject to penalties and interests because of withdrawals George made. However, he presents no numbers from which the court can set a judgment amount.

### Treble Damages

The statute clearly allows the imposition of treble damages, but the award is not automatic. An award of treble damages "is within the Court's discretion based on what is fair under the circumstances," *In re Stewart*, 499 BR 557, 570 (Bankr ED Mich 2013). See also *Hoffenblum v Hoffenblum*, 308 Mich App 102; 863 NW2d 352 (2014).

Case:16-80049-jwb Doc #:143-1 Filed: 06/08/18 Page 17 of 18
Case:16-80049-jwb Doc #:120-2 Filed: 05/18/17 Page 16 of 100
Case:15-06752-jwb Doc #:15-2 Filed: 02/22/16 Page 16 of 17

However, the *Hoffenblum* court seemed to raise the bar for the imposition of treble damages. It said that:

> The district court ruled that it would not award treble damages, which are designed to penalize or punish 'dishonest defendants.'

Finally, it appears that the court, in considering this issue, can choose to either award or deny treble damages, but it lacks the discretion to impose a number between those two extremes. *Polybond v Gen Tech Corp*, unpublished per curium opinion of the Court of Appeals, Docket No. 290429 (July 27, 2010).

The court declines to enter a treble damage award here, for these reasons. First, Kevin's instructions about how and when to use this money were vague and ambiguous. Second, George did perform many tasks for his father. Third, George did have some "claim of right" to the $15,000 to be paid from the divorce proceeds.

### Attorney Fees and Costs

The court will allow Kevin to recover his attorney fees. Attorney Van Eck has filed an attorney's lien, which Kevin contests. In any event, the amount of the lien may not represent all the attorney fees incurred- it typically represents only the unpaid balance. Kevin will have to properly present this later.

The MDOC also seeks a currently unknown amount for reimbursement of the transportation costs it incurred in bringing Kevin to court.

MCL 600.2405 provides that certain items "may be taxed and awarded as costs unless otherwise directed." Subsection (1) provides for "any of the fees of . . . other persons mentioned in this chapter." MCL 600.2421b(1) defines "costs and fees" as "the normal costs incurred in being a party in a civil action after an action has been filed with the court." Kevin, as the plaintiff, is a party as defined by MCL 600.2421b(2).

Case:16-80049-jwb Doc #:143-1 Filed: 06/08/18 Page 18 of 18
Case:16-80049-jwb Doc #:120-2 Filed: 05/18/17 Page 17 of 100
Case:15-06752-jwb Doc #:15-2 Filed: 02/22/16 Page 17 of 17

Kevin's MDOC costs are unusual in that few prisoners successfully litigate their cases to trial. Yet, the court cannot saddle him—as a prevailing party—with the bill because the Michigan Constitution provides a party the right to proceed without an attorney. Accordingly, the court will add those amounts- after proper notice and giving the parties a chance to be heard.

These things must happen within 21 days from the date of this opinion and order:

   a. Kevin must submit proper documents which establish the amount of attorney fees incurred, and which comply with *Smith v Khouri*, 481 Mich 519; 751 NW2d 472 (2008).

   b. The Department of Corrections must send its bill for transportation costs to the court, with service upon both parties. The bill must show sufficient detail for the court to assess its validity.

Kevin should delay presenting a final judgment until these subordinate costs are affixed through a court order. He will be able to recover "routine" court costs and statutory (post-filing of complaint) interest at that time as well.

IT IS SO ORDERED.

Date: July 16, 2015

Timothy G. Hicks, P35198
Circuit Judge

c: Melody Wallace, Legal Affairs, Michigan Department of Corrections

CERTIFICATE OF MAILING
I hereby certify that on the 16th day of July, 2015, I personally mailed copies of this Order to the parties above named at their respective addresses, by ordinary mail.

Susan K. Orrison, Circuit Court
Legal & Scheduling Secretary