EXHIBIT "I"

(From Videotape, 7-9-15, 8:33:58)

1    THE COURT: Drager.

2    MR. SYVER: Dragon, Drager. And, judge,

3    I'd ask that you dismiss this as a no cause of action.

4    Like I said, if I could, my heart of hearts, what the

5    right thing would be to do, if I could do the right thing

6    5,262.62 but, judge, with the oaths that everybody took to

7    become attorneys I can't. I can't do it.

8    THE COURT: All right.

9    MR. SYVER: I just can't do it by, by court

10   rule, statute and case law I can't do it.

11   THE COURT: All right. Thank you.

12   MR. SYVER: Thank you, judge.

13   THE COURT: Let's take a short break and

14   then we'll hear from Kevin in his closing argument. Thank

15   you.

16   MR. SYVER: Thank you, judge.

17   (Court in recess at 3:47:26)

18   (Court resumes at 4:05:56)

19   THE COURT: All right. Back to work on our

20   Wigger case. Closing argument by Kevin. Kevin?

21   MR. WIGGER: All right, your honor. First,

22   I'm gonna need to (undistinguishable) one thing to this

23   board 'cause we gotta concentrate and I, when I did my

24   opening arguments I tried to reiterate the fact that we're

25   talking apples and oranges. We're talking about pension

(From Videotape, 7-9-15, 8:33:58)

account that I had when I got locked up, OK?  Then in late

December of '06 is when my stock rollover check was

deposited to my IRA.  So what I'm gonna put on here -

THE COURT:  And it's the stock rollover

check that's the subject of the fcse, right?

MR. WIGGER:  Yes, that's the money he took.

THE COURT:  Yeah.

MR. WIGGER:  That's the money he took.  So,

what I'm gonna put on here is the date, all of the

defendant's exhibits, my son's exhibits all date in

between April of 2006 and December 1st, 12-1 of '06, OK?

That's, this is the time line that, that's the most

critical an all this.  All of them letters, all of them

exhibits, all tell George I'm, I'm locked up in county,

OK?  I'm, I'm, I made a moral mistake but the thing about,

difference in between me and my son I admitted to my

mistakes, I took responsibility for it and I paid the

price for it.  He's been caught with his fingers in a

cookie jar and now wants to try to deny the whole thing.

All the letters, I'm trying to help him, OK?  I'm trying

to help my wife.  The only funds that I have any access to

is my pension account that's a preexisting account with

$36,000 in it that is at 5/3rd Bank, OK?  I don't have

access to the money that was taken.  The IRA.  That money

was not realized until almost the end of '06, December,

(From Videotape, 7-9-15, 8:33:58)

1   the end of December.  Checks were dated December 5th.  So

2   now over and over again I tell George, hey, if you need

3   money we're gonna have to use that pension account.  In

4   April I write him a letter, I tell him, OK, I'm gonna get

5   you a power of attorney, I said, we're gonna have to use

6   that money from the pension account to do whatever work

7   you wanted.  I've talked with your mother.  That's what

8   your mother says she's gonna need the money for and so

9   that's the money we're gonna use.  So I give him

10  permission to use that money.  No restrictions, OK?  No

11  terms, no nothing, OK?  I knew from talking with my wife

12  that I was gonna give this money to her anyway, OK?  She

13  was gonna get, she getting everything.  I can't take

14  anything to prison.  I can't have any assets, nothing when

15  I go to prison.  So, now I do the durable power of

16  attorney on the ninth of June.  But judgement of divorce

17  ain't until August, two months later.  Now George has full

18  control, he has the power of attorney, he can do whatever

19  he wanted.  He could've gone in and completely drained

20  that pension account and used it on that house.  He

21  testified he used none of it.  Didn't use a dime of it.

22  That to me doesn't make no sense.  So now we, we're going

23  all the way up until November and December in letters that

24  I wrote to him they, and I'm still telling him if you need

25  to fix the roof use that pension money.  Your mother told

(From Videotape, 7-9-15, 8:33:58)

1    me that's why she needed it, you know, if she's gonna give

2    it, you know, take it out, do whatever you have to do get

3    it, OK?  And if you can't, you know, that's fine.  If she

4    don't want you to use it then fine.  Then I tell him use

5    my credit cards.  Take my credit cards.  My Sears and

6    Menards cards.  Use that to pay the taxes, buy the

7    materials for the roof and do what work you need to do.

8    George testifies he be, he never used 'em.  So now we're

9    getting into '07, I'm nothing (undistinguishable) the

10   house is deeded over, the house is deeded over in June.  I

11   no longer have no responsibility for that house.  It, as

12   far as I'm concerned that house belongs to his mother.

13   The durable, in the, in the judgement for divorce it says

14   the house has to be listed for sale.  George had already

15   decided, before that divorce was finalized in '06, he had

16   already made the decision not to buy that house.  So why

17   would I or him, why would anybody put money into a house

18   that's gotta be listed for sale?  That was stipulated in

19   the divorce.  George knows darn well I don't, I think he

20   actually conspired with his mother a little bit on some of

21   this when it, when it says, calls that 15,000 a loan.  I

22   don't know whether this is a loan that he gave us or, or

23   we gave him.  That was supposed to be the 15,000 that -

24                MR. SYVER:  Judge -

25                MR. WIGGER:  - I was trying to look out for

(From Videotape, 7-9-15, 8:33:58)

1   him.

2   　　　　　MR. SYVER:  Object.  He's testifying to

3   things that were not brought into evidence.  Were -

4   　　　　　THE COURT:  What one?

5   　　　　　MR. SYVER:  - not testified to and that

6   includes -

7   　　　　　MR. WIGGER:  What, what -

8   　　　　　MR. SYVER:  - what George thought back in

9   not buying the house '06.

10   　　　　　THE COURT:  Well, what, specifically is it

11   that he's, you're objecting to?

12   　　　　　MR. SYVER:  He, he's testifying to facts

13   that are not been brought out through evidence or

14   testimony.

15   　　　　　THE COURT:  Overruled.  I think he's

16   arguing reasonable inferences from the facts.

17   　　　　　MR. SYVER:  I guess the main objection is,

18   judge, he's saying George didn't intend to, to, to live

19   there back on '06 and we have to least reserve the

20   objection because he's testifying to things that George

21   didn't testify to, judge, and -

22   　　　　　THE COURT:  Well, I think he linked to the

23   clause of the judgement of divorce.  He said, hey -

24   　　　　　MR. SYVER:  We just have to reserve the

25   objection, judge.

(From Videotape, 7-9-15, 8:33:58)

1        THE COURT:  Fair enough.

2        MR. SYVER:  Thank you.

3        MR. WIGGER:  With, the judgement of divorce

4  says the house was to be sold.  George, using my durable

5  power of attorney deeded, quick deeded the property over

6  to himself and his mother on this life estate thing.  Then

7  at the same, around the same time he also quick deeded my

8  other property, that I got that, and he quick deeded, er,

9  he transferred all my vehicles and all this other stuff

10  all over to my wife.  That was the intension of the power

11  of attorney for him to be able to take care of

12  (undistinguishable).  I also had horses and you name it.

13        THE COURT:  This is the Johnson Road.

14        MR. WIGGER:  This is the Johnson Road.

15  Now, George told me, OK, this is a statement George made

16  to me –

17        THE COURT:  Is this in evidence?

18        MR. WIGGER:  We're talking, talking about

19  the semi-truck.  What George –

20        THE COURT:  No, but is this, the statement

21  you're about to talk to me, is it, is this in evidence?

22        MR. WIGGER:  Yes.

23        THE COURT:  You can't get into stuff,

24  George –

25        MR. WIGGER:  It's talked about in the

(From Videotape, 7-9-15, 8:33:58)

letters.

THE COURT:  OK.  Go ahead.

MR. WIGGER:  It's talked about in the letters.  In the letters I wrote to George I ask him how the semi did on ebay, OK?  There's also a letter in there where I state your mother's not gonna put anything up on ebay, she don't know how to and she's not gonna even learn.  George, I was told, he was paid the 15,00 by his mom and irregardles, because of the judgement of divorce that 15,000 was supposed to come from the proceeds from the sale of the home.  I have no, um, no right to any of those proceeds, OK, so I can't be held responsible to pay George $15,000 for something, 'cause I'm not getting half of it.  I'm not getting half of whatever the house would see for.  I never, I never even knew anything.  They kept me so far in the dark his mother remarried 45 days after I went to prison, oh, after we signed the divorce.  After this was finalized she remarried 45 days later.  Nobody told me two years later.  They never told me.  I never knew that his mother remarried.  Not for two years.  They kept me in the dark on everything.  I was never informed about all this repair work.  The only thing I knew about was that the roof needed to be done and, to be honest with ya, I think George actually did the front part of the house because it was added to the building permit.

(From Videotape, 7-9-15, 8:33:58)

1  THE COURT:  You mean the roof

2  MR. WIGGER:  The roof.  The front part, OK,

3  over the porch because it was added to the building

4  permit.  I took out a building permit for that house in

5  2005.  I bought all the drywall.  I bought all the, all

6  the windows, I bought the insulation, we did the

7  electrical, had the electrical inspection because the

8  electrical inspector came in and said, told us we had to

9  put metal plates in so we didn't hit 'em with the screws

10  to put the drywall in.  I sat at the base of the stairs

11  and ran the insulation blower while he's up in the attic

12  blowing the insulation in.  The rooms I wanna say were

13  even painted by the time I got arrested, the rooms,

14  everything was done, OK?  The only thing I think that

15  needed to be done was maybe floor coverings but I, up to

16  that point everything that had been done to that house I

17  paid for.  George did a lot of the work.  I'll admit that.

18  George did a lot of work.  He was (undistinguishable).  I

19  gave him that opportunity as kind of as a learning

20  experience (undistinguishable) here, you know, here, this

21  house.  Do what you want with it, you know it's a learning

22  experience for ya.  I'm buying all the materials.  I spent

23  so much on material I couldn't even afford to pay the

24  taxes, OK?  The house, I had to do almost $5,000 worth of

25  work to that house before he could even move in because

(From Videotape, 7-9-15, 8:33:58)

1 the house was dead. The house had laid, sat empty for ten
2 years so it was dead. We had to, I had to replace all the
3 plumbing, the electrical service, the hot water heater,
4 the furnace, the floor coverings, everything on the ground
5 floor before they would give me an occupancy permit 'cause
6 I was gonna rent the house to George. The house had to be
7 inspected. Had to meet their criteria. I did it. I paid
8 for all that, not George. George didn't pay for no
9 windows. George didn't pay for no drywall. Now, he
10 might've put another wall up upstair though after the
11 fact, I don't know. That, that's his plan but now if I
12 were to come to court and tell your honor, ah, my son took
13 all this money and I've got it all written down in here on
14 paper, you say well, do you have any proof? Now, but I
15 got it all written down. I mean, that's, heck, that's
16 30,000, 32,000, whatever it is. George never spent that.
17 He never spent that. They're even trying to throw in the
18 7,500 I gave George, that George testified came out of my
19 pension account. He's trying to throw this in there, OK?
20 He's trying to throw the 15,000 (undistinguishable). You
21 owe that to George. No, his mother did. His mother got
22 the house. His mother was the one that would benefit from
23 the sale of that house and if she didn't pay him that's in
24 between George and his mother. None of them letters, not
25 a single one of 'em says anything about taking money out

(From Videotape, 7-9-15, 8:33:58)

1    of my IRA, OK?  In fact, it said, one of 'em says

2    something to the contrary that tells him not to use it.

3    That money cost me way to much.  That was 30 years of my

4    hard work and my retirement and I was mad enough having, I

5    gave my wife over $80,000 in the divorce.  She got the 36

6    plus another 44 out of my IRA.  Out of my -

7                    MR. SYVER:  Objection.  There was no -

8                    MR. WIGGER:  - stock check.

9                    MR. SYVER:  There was no testimony as to -

10                   THE COURT:  I agree about that.

11                   MR. SYVER:  - he not use.  Thank you.

12                   MR. WIGGER:  Well that's, it's in the

13    divorce.  It's right in the divorce.

14                   THE COURT:  (Undistinguishable).

15                   MR. WIGGER:  Twenty-five percent.

16                   THE COURT:  So Ada got 44 plus what?

17                   MR. WIGGER:  She got 44 plus 36.  That's

18    right in the judgment of divorce.  Plus everything lock,

19    stock and barrel.  The, as far as I was concerned if any

20    taxes were due they were responsible.

21                   THE COURT:  How much money then did you

22    provide to Kevin, make available to him to do this stuff?

23                   MR. WIGGER:  To George?

24                   THE COURT:  I'm sorry, to George.  Thank

25    you.

(From Videotape, 7-9-15, 8:33:58)

1    MR. WIGGER:  The 36,000.

2    THE COURT:  Plus the paycheck?

3    MR. WIGGER:  Plus the paycheck.

4    THE COURT:  Plus the tools?

5    MR. WIGGER:  Plus the tools.  That was

6    supposed to be for my support and even there George

7    testifies first, when I ask George -

8    THE COURT:  (Undistinguishable) it was

9    about $2,000 between the paycheck and the tools wasn't it?

10   MR. WIGGER:  Yes.  Yes.

11   THE COURT:  OK.

12   MR. WIGGER:  And when I asked George about

13   that, I said, I asked him who got his last paycheck.  He

14   said he did.  I said, don't you remember how much it was.

15   He couldn't remember.  I showed him a pay stub and he

16   says, well, I don't remember it being that much.

17   MR. SYVER:  Judge, George testified that

18   his mother got it through direct deposit.

19   MR. WIGGER:  Well, that's my point.  His

20   testimony can't be trusted 'cause -

21   THE COURT:  Well, hold on.  Overruled.

22   There are competing versions here.  Overruled.  Go ahead.

23   MR. WIGGER:  Then I asked him about the

24   tools.  He said he got the money for the tools.  He sat

25   right up on the stand and said that.  Then I asked him how

(From Videotape, 7-9-15, 8:33:58)

1    much.  He said, oh, I can't remember.  When I said was it

2    around $1,200 and he said, well, it could've been.  He

3    didn't really confirm or deny it.  Then the next day at

4    trial when his attorney has him up on the stand now all

5    the sudden he, his attorney asked, well, where'd my last

6    paycheck go?  He said direct deposit.  Then he asked about

7    the tools.  He said, oh, direct deposit.  Well, as a

8    matter of fact in 2005, in November 2005 I was sentenced

9    to work release here at county.  That required that I had

10   to submit my paycheck and pay them a percentage of my

11   wages for my stay in my work release program.  I had

12   Modular Systems stop my direct deposit way back in

13   November of 2005 because of that fact, because I was on

14   work release.

15              MR. SYVER:  Judge, we haven't had any

16   evidence of this period.

17              MR. WIGGER:  Well, he doesn't have no proof

18   that -

19              THE COURT:  Well, I don't think anything

20   but I don't think we have any evidence about December of

21   2005 with your Modular stuff.

22              MR. WIGGER:  Right.  Right.

23              THE COURT:  So you gotta stay away from

24   that.

25              MR. WIGGER:  OK.  But now in light of

_Mills Court Reporting,_  1615 Sunset, N Muskegon, MI 49445  231-744-6823

266

(From Videotape, 7-9-15, 8:33:58)

1    everything else George says that he did the entire roof.

2    George didn't do the entire roof.  I did, in then later on

3    he admits that him and I did the roof over the garage and

4    the bath, and the lower bath.  We did that way back in,

5    like, 2004 and now the current owners have taken out a

6    building permit to do the, the back side of the upper part

7    of the house that was never done, OK?  So, that only

8    leaves the front part of the house, OK?  There again, I

9    think George did that roof but I think his mother is the

10   one that paid for the materials, OK?  His mother was given

11   $80,000 to do that work and so that's –

12            MR. SYVER:  Judge, that wasn't in testimony

13   at all.

14            THE COURT:  I think he's right on that,

15   Kevin.  I know you're speculating about this but I don't

16   think we have any testimony that Ada gave him any money.

17   Let me ask you this, the new owner, Arvey, did get a

18   building permit –

19            MR. WIGGER:  Yes.

20            THE COURT:  – and in the building permit he

21   said he wanted to do the roof, right?

22            MR. WIGGER:  Correct.

23            THE COURT:  So why'd he do that if you guys

24   already did the roof?

25            MR. WIGGER:  That's what I'm stating.  The,

(From Videotape, 7-9-15, 8:33:58)

1  George did not do the roof.  George, George did spend, if
2  you look at drywall the, the cost that George says on
3  drywall, he says $2,000 for drywall.  Now, if you use the
4  numbers that are in his receipts that means that, that's
5  enough to buy 262 sheets of drywall.  Now, if you stack
6  that up, that's a pile of drywall ten feet tall, OK?  That
7  house is only 1,500 square feet total, upper and lower
8  level, OK?  He stated after I did, I paid for the
9  upstairs, OK?  I took out the building permit for the
10  upstairs so I paid for the materials.  I wasn't, I was out
11  there -
12          MR. SYVER:  Once again, judge, there was no
13  evidence that he paid for any material brought in.  If he
14  would've we would've challenged it and asked for receipts.
15  There was no evidence that Kevin Wigger -
16          THE COURT:  I don't remember that you
17  testified that you bought the materials added on.
18          MR. SYVER:  I apologize about objecting
19  it's just, I have to.
20          MR. WIGGER:  See I, all I can testify is I
21  took out the building permit, OK?
22          THE COURT:  You can do that.  So I'm
23  sustaining the objection.
24          MR. WIGGER:  Yeah.  But, ah, George was,
25  George has stated that this, the, in this email, this

(From Videotape, 7-9-15, 8:33:58)

1  31,000, um, but yet has no receipts. Has not a single

2  receipt other than what he showed today for roughly

3  $3,000. He, in, in one point of his testimony George said

4  he spent 5,000 of his own money and then he put the rest

5  on credit cards but then he testified later on and says,

6  well, his credit card had a limit of 5,000 on one and

7  1,800 on the other. But there, he's thrown so many

8  numbers our here that he's even got me confused, um,

9  because what they're trying to do is they're trying to

10  take all this and put in a bag and shake it up and trying

11  to see if we can sort it all out, OK? It's easy to sort

12  out. George did not have any permission, period. There's

13  nothing to show that George had any permission to sue any

14  of that $51,200. I honestly believe, and I put this in

15  my, in my fourth amended complaint that now George has

16  testified he's the one that took the check to the bank. I

17  honestly believe he peeled another eight, $9,000 off the

18  top of that before he even put it in the bank because my

19  mother tells me the bank told her -

20           MR. SYVER:  Objection. Judge, he can't -

21           MR. WIGGER:  - in (undistinguishable) -

22           THE COURT:  Well -

23           MR. SYVER:  - testify to hearsay.

24           THE COURT:  - my mother told me. I don't

25  think -

(From Videotape, 7-9-15, 8:33:58)

1    MR. WIGGER:  OK.

2    THE COURT:  - we had that.

3    MR. WIGGER:  There's evidence to show that,

4    and this is all gonna be coming that my beginning balance

5    was only 129,000.

6    MR. SYVER:  Judge, we have had no evidence

7    of 129,000.  Judge, today is trial.  If it's coming it's

8    too late.  We've got mandatory joinder -

9    THE COURT:  Well, hold on Mr. Syver.  I

10   think he's right.  This is, this is it.

11   MR. WIGGER:  All right.  Well, they -

12   THE COURT:  I mean, there's no more we're

13   gonna bring this in later.

14   MR. WIGGER:  Right.

15   THE COURT:  (Undistinguishable).

16   MR. WIGGER:  So, anyway, he's -

17   THE COURT:  Let me ask you this:  Where -

18   MR. WIGGER:  Yeah.

19   THE COURT:  Where did George get the 7,500

20   that he and Alisa had in December of '06?

21   MR. WIGGER:  That came out of the pension

22   account.

23   THE COURT:  But I, there wasn't enough

24   there was there?

25   MR. WIGGER:  I don't understand it either,

(From Videotape, 7-9-15, 8:33:58)

1    OK?  That's just George's testimony.

2            THE COURT:  Just trying to do that math and

3    I thought if Ada got 36 and he gave 5,500 to Ed Washura

4    and he kept -

5            MR. WIGGER:  Yeah.

6            THE COURT:  - 7,500 I -

7            MR. WIGGER:  Well, see I, and I've

8    questioned the same thing because that account originally

9    had $80,000 into it.  I gave my parents 32,000 out of and

10   there should and granted -

11           THE COURT:  That's -

12           MR. WIGGER:  - there should've been some

13   gains.

14           THE COURT:  Mr. Syver's gonna

15   (undistinguishable) about it.  He doesn't wanna jump up

16   and down all the time -

17           MR. WIGGER:  Yeah.

18           THE COURT:  - but you are lapsing into

19   things that really aren't in evidence here.

20           MR. WIGGER:  Right.  Right.

21           THE COURT:  As part of the flavor of the

22   case I get it but it's, but it's not in evidence.

23           MR. WIGGER:  But, anyway, well, I guess

24   what I'm -

25           THE COURT:  We don't know where he got the

(From Videotape, 7-9-15, 8:33:58)

1    7,500.

2            MR. WIGGER:  His testimony took it out of

3    the pension account.

4            THE COURT:  Right.  But the math doesn't

5    work, does it?

6            MR. WIGGER:  No, it doesn't.

7            THE COURT:  OK.

8            MR. WIGGER:  But -

9            THE COURT:  Unless Ada got less and we

10   don't know she -

11           MR. WIGGER:  Right.  But he's never said

12   anything that it came out of the IRA.  He's, he's already

13   testified and, and if he's confused about all that as to

14   where -

15           THE COURT:  Well, and I think he said that

16   that 7,500 had nothing to do with the numbers on exhibit

17   ten.

18           MR. WIGGER:  Correct, which is all the

19   withdrawal slips, yes.

20           Now, the next thing, George, has

21   claimed, testified on the stand that he made a 1,000 a

22   week.  Under your questioning, I believe, your honor, he I

23   believe it's you that asked him the question, he said,

24   well, I made, 'cause we were trying to figure out where he

25   got $5,000 of his own money which he claimed he used for

(From Videotape, 7-9-15, 8:33:58)

1    doing these repairs.  He stated at that time he made a

2    $1,000 a week.  That's $52,000 a year, OK?  I've never

3    made that much money.  Then today he testifies he only

4    made $14,50 an hour.  OK.  Big difference.  If you start,

5    if you start doing all the math there's no way that George

6    could ever save hardly any money.  He's living mouth to

7    hand or hand to mouth.  His own letter, his own letter

8    from August 12th says he can't even afford a cell phone

9    bill, OK?  His, he's, they're young.  His wife's only

10   working part time and he don't know how much she's making

11   but he just don't make enough money.  It, it, none of it

12   makes any sense at all.  I mean, he testified today he

13   spent $10,000 on the Carr Road residence, OK?  I contend

14   that was my money.  He bought the Whiskey Creek.  My

15   money.  Then he turned around -

16           MR. SYVER:  Objection, judge.  It was never

17   established that Whiskey Creek was used with his money.

18           THE COURT:  Well, that's his position.

19   Overruled.

20           MR. WIGGER:  Then he turns around and he

21   quick deed, when I sent him a demand letter in June of

22   2013 less than 30 days later he quick deeds that over to

23   his brother over to his uncle for a buck.  Says he can't

24   afford the taxes on it.

25           MR. SYVER:  Judge, once again, testifying

(From Videotape, 7-9-15, 8:33:58)

1  to things that aren't in evidence.  I never saw a demand

2  letter come into evidence.

3          MR. WIGGER:  It's, ah, it's attached to

4  every one of my complaints.

5          MR. SYVER:  Doesn't matter.

6          THE COURT:  May have been -

7          MR. SYVER:  I look at that.

8          THE COURT:  I don't think I have it as

9  evidence here.

10          MR. WIGGER:  OK.  (Undistinguishable).

11  Anyway, now in George's attorney opening remarks, he

12  stops, put his hand up in the air and he said George

13  wanted nothing to do with his father after I asked him to

14  take envelopes to Shelby Navar in April 2006, OK?  Now, if

15  George felt that strongly, and I never knew it, the first

16  time I knew this is when I got his request for admission

17  in December of 2014, OK?  First time I ever even heard

18  anything like that but now he's claiming way back in April

19  of '06 he wants nothing to do with his dad.  So then I

20  gotta ask myself, well, why did he take the power of

21  attorney, OK?  The only reason I can think of is he was,

22  his whole intention was to defraud me and, and to cheat

23  me, OK?  So then he turns around, his mother, I don't get

24  along with his mother at all, he works with his mother who

25  he really don't get along with and I think this is all

(From Videotape, 7-9-15, 8:33:58)

1  concocted to defraud me.

2          MR. SYVER:  I'm sorry, judge.  We have to

3  object as well.  He didn't never put in that it was back

4  in 2006.  Relationship fell apart around when he sent the,

5  ah, the I'm sorry letter, I borrowed and, ah, that's about

6  the same time that it's our understanding that Mr. Kevin

7  Wigger asked for George to have contact with this young

8  lady.

9          THE COURT:  So the objection is?

10         MR. SYVER:  Basically it's the facts not

11 placed in evidence.

12         MR. WIGGER:  He, I placed this, I went, I

13 gave the testimony myself, OK?

14         THE COURT:  About?

15         MR. WIGGER:  About Shelby Navar and -

16         THE COURT:  I think he did.  Overruled.

17         MR. WIGGER:  - that was way back in '06.

18 In 2012 Shelby's in college, OK?  Shelby's now 23 years

19 old.  I have had -

20         MR. SYVER:  I -

21         MR. WIGGER:  - absolutely never tried to

22 have any contact with her since I sent the letter to the

23 victims rights association in Lansing in 2010, OK?  George

24 had nothing to do with that.  So now Mr. Syver wants him

25 to believe that this all hap0pened in 2012.  It didn't,

(From Videotape, 7-9-15, 8:33:58)

1    OK?  This goes all back to 2006.  George didn't want

2    nothing to do with me, OK, but yet he took my power of

3    attorney.  George kept me in the dark about everything.

4    Didn't tell me that his mother remarried.  He didn't tell

5    me about any of these repairs.  He never asked me for

6    permission and then the truck, that, that's what was

7    really blew me away.  I knew, I never knew he had to put a

8    new motor or transmission in his truck.  Knew nothing

9    about it, OK?

10            THE COURT:  Today's the first time you

11    heard about it?

12            MR. WIGGER:  Today is the first time I

13    heard about that one, OK?  He had to, ah, it, it's hard to

14    keep, like I say, if I were to come to court and say

15    George did this and George did that without any proof Mr.

16    Syver would've laughed me out of court, which he wants to

17    do anyway, so now he's come to court and he's made all

18    these assertions and provided no proof.  None, OK?  He

19    paid the taxes.  He has no proof.  Put 65 of 5,000 into

20    the roof.  Has no proof.  Claims he, claims he spent $45 a

21    bundle.  That's a high priced shingle, OK?  The shingles

22    that he had to match I paid $49, $47 a square for at

23    Menards.  $5,000 would buy a stack of shingles over 32

24    feet tall if you were stack up one square per layer and

25    take $5,000 at $47 a square, which is what the shingles

(From Videotape, 7-9-15, 8:33:58)

1  were going for back then, and stack them up would be a
2  stack of shingles 32 feet tall.  The plaster, he says he
3  was, ah, 25 to $30 per bucket.  I dare say probably if you
4  looked today that wouldn't be much over $23 today.  I
5  used, when I bought it it was around $15 a bucket.  When I
6  did the up, when we did the upstairs I think I bought two
7  buckets.  George claims he paid $500 for plaster.  That's
8  enough to buy 33 of them buckets.  That, if you stack all
9  of them up you're talking a stack nine feet tall.  That's,
10  ah, 165 gallons of plaster, OK?  To do what?  Dare I say,
11  no proof.  George has no proof of any of it.  George has
12  no receipts for no windows.  George has no receipts for
13  nothing other than what he has shown us today.  And those
14  receipts were all done after this house was deeded over to
15  him and his mother.  I had nothing to do with it.  I
16  didn't approve that.  I didn't tell him that he could take
17  my money to do those repairs.
18          MR. SYVER:  Judge, we're once again
19  testifying.  He never said that on the, on the, ah, the
20  witness stand.  Mater of fact, the only evidence that came
21  in was by George who said he went down and met with his
22  dad and his dad told him to do this stuff.
23          THE COURT:  There's some contested issues
24  here.  I think there's evidence about the timing of the
25  Menards receipts.  There's evidence about the timing of

(From Videotape, 7-9-15, 8:33:58)

1   the quick claim deeds.  Overruled.

2           MR. SYVER:  Thank you, judge.

3           MR. WIGGER:  And just to, to reiterate how

4   bad George wants to hurt me, OK, and that's been his

5   intent right along is now they've contacted the AG.

6           MR. SYVER:  Objection, judge.  He doesn't

7   know who's contacted the AG if anybody.

8           THE COURT:  Well, a couple things, that's

9   not in evidence and I can tell you right now, Kevin, that,

10  ah, they've contacted the Court directly.  Now, I don't

11  know what prompted that but -

12          MR. WIGGER:  Well, somebody contacted them.

13  I could always sue anyway.

14          THE COURT:  Yeah.  So now, we don't have

15  any facts about that.

16          MR. WIGGER:  When it comes to my

17  typewriter.  George bought me my typewriter way back in

18  '06, in October of '06.  Then he claims that he took the

19  money out of my account in the middle of '08, two years

20  later for the typewriter.  That makes no sense.  George

21  says he spent 45, I don't know whether it's 45, 75, I

22  don't know how much it is he claims that he spent on my

23  commissary but he has no receipts, OK?  He claims the MDOC

24  accounting doesn't show things, well, if it doesn't then

25  he should've come up with receipts and said, well, here,

(From Videotape, 7-9-15, 8:33:58)

1    this is what I spent.  He didn't, he has nothing.  He

2    can't prove a thing, OK?  He can't prove that he spent any

3    of this money.  He can't prove that he had any permission,

4    OK, and if none of this was done my benefit and for my

5    use, which it wasn't, that could only mean that he could

6    converted it for his own use, OK?  When you read the power

7    of attorney and you read MCL7005501, which covers durable

8    power of attorney, definition of attorney and fact, we go

9    to number three, it says -

10                   MR. SYVER:  Judge -

11                   MR. WIGGER:  - attorney -

12                   MR. SYVER:  - that never came into

13   evidence.

14                   THE COURT:  It's the statute, isn't it?

15                   MR. WIGGER:  It's the statute.

16                   MR. SYVER:  OK, judge, but it never came

17   into evidence and it hasn't, I don't think it's been plead

18   other than it was put into the opinion of the Court on the

19   motions for summary disposition.

20                   THE COURT:  Overruled.  He's just reading

21   the statute.

22                   MR. WIGGER:  Yeah.

23                   THE COURT:  It doesn't have to be in

24   evidence.

25                   MR. SYVER:  Not relevant, judge.

(From Videotape, 7-9-15, 8:33:58)

1    THE COURT:  Well, that's a different issue.
2    I think there's some relevance.  Go ahead.
3    MR. WIGGER:  Reads as follows:  An attorney
4    in fact designated and acting under a durable power of
5    attorney has the authority, rights, responsibilities and
6    limitations as provided by law with respect to a durable
7    power of attorney including but not limited to all of the
8    following:  Except as provided in the durable power of
9    attorney of fact shall act in accordance with the
10   standards of care applicable to fiduciaries exercising
11   powers under durable power of attorney.  The attorney of
12   fact should take reasonable steps to follow the
13   instructions of the principle.  On request of the
14   principle the attorney of fact shall keep the principle
15   informed of the attorney in facts actions.  The attorney
16   of fact should provide an accounting to the principle upon
17   request of the principle to the conservator or guardian
18   appointed on behalf of the principle upon request to the
19   guardian of conservative pursuant to judicial order.  An
20   attorney of fact shall not make a gift of all or any part
21   of the principle's assets.  Unless provided in the durable
22   power of attorney or judicial order the attorney in fact,
23   while acting as attorney in fact shall not create an
24   account or asset in joint tendency between the principle
25   and the attorney in fact.  The attorney in fact shall

(From Videotape, 7-9-15, 8:33:58)

1   maintain records of the attorney in facts actions on the

2   behalf of the principle including transactions, receipts,

3   dispersements and investments.  The attorney of fact may

4   be liable for any damage or loss to the principle and may

5   be subject to any other available remedy for breach of

6   fiduciary duty owed to the principle in the durable power

7   of attorney.  The principle -

8           THE COURT:  You have not plead breach of

9   fiduciary duty have ya?

10          MR. WIGGER:  No, no, but the principle may

11  exonerate in the power of attorney but that, it, my main

12  things is he should be keeping records.  He was asked to

13  keep records.  He was asked to keep me informed.  He

14  didn't.  He failed on all of 'em.  Never kept me informed.

15  Never provided me with any records.  He never asked

16  permission to use any of money.  He was never given any

17  permission to use my money.  There is no evidence given

18  him permission to use any of my money.  None of that money

19  if, whatever, even the 30, $3,000 that he had in receipts

20  went into that house that did not benefit me.  I stand to

21  benefit nothing from that house, OK?  The only thing that

22  that -

23          MR. SYVER:  Judge, we have to object.  It

24  was his asset.  We've proved that it was his asset -

25          MR. WIGGER:  My name was on the mortgage.

(From Videotape, 7-9-15, 8:33:58)

1      MR. SYVER:  - (undistinguishable).

2      THE COURT:  This is legal argument,

3  gentlemen.  I understand the issues.

4      MR. SYVER:  Own, exhibit -

5      THE COURT:  Thank you, Mr. Syver.

6      MR. WIGGER:  My name was on the mortgage,

7  not on the house, not on the asset itself.  All of the,

8  (undistinguishable) name is on that says that I owe money

9  from borrowing it.  My name was not on the property so

10  hence the property was not my responsibility.  After June,

11  what'd I do, yeah, whatever day that it was signed, June

12  6th, I believe, it's not up there, that that house was

13  deeded over by George using my durable power of attorney,

14  used my name, the durable power of attorney, assigned that

15  house to him and his mother.  That house became the

16  responsibility of George and his mother, not me.  The

17  taxes were not my responsibility.  That house was not my

18  asset, OK?  It was not in my name, OK?  My name was on the

19  mortgage but as far as the asset itself George deeded that

20  to himself and his mother.  I had nothing to do with it so

21  I think I've proved all the elements for embezzlement,

22  which coincide with, you can take, ah, conversion.

23      MR. SYVER:  Judge, once again we have to

24  object.  The Court order, or issued in it's last order

25  that there was no embezzlement here and we have not been

(From Videotape, 7-9-15, 8:33:58)

1  in trial for embezzlement.

2          THE COURT:  It's part of the statute.  I

3  understand that issue, Mr. Syver.  Thank you.

4          MR. WIGGER:  Conversion is any distinct

5  actor or dominion wrongfully exerted over anothers

6  personal property in denial of or inconsistent with his or

7  her right therein.  It, um, that's Thomas V Trace Motor

8  Sales Incorporated 360 Mich 324, 104 northwest 2d360.

9  When you look under 6002919a, stealing, embezzling or

10 converting the property, OK?  First main words.  When you

11 look at, it's kind of all in overlap 'cause I do put

12 embezzlement in my complaint as George has met all the

13 criteria.  George, the money belonged to me, that's a

14 proven fact.  George had a relationship of trust because

15 he was given my durable power of attorney.  George

16 obtained possession of my money because of that

17 relationship.  George converted the money to his own use

18 without my consent.  George did this, he intended to

19 defraud or cheat me and that this money had the fair

20 market value I contend of close to $60,000.  It, um -

21         THE COURT:  Which property had that value?

22 The house -

23         MR. WIGGER:  My -

24         THE COURT:  - on Third Street?

25         MR. WIGGER:  Pardon me?

(From Videotape, 7-9-15, 8:33:58)

1    THE COURT:  What had the value of $60,000?

2    MR. WIGGER:  My IRA.  The money that was

3    taken.  It had a market, fair market value I contend of

4    close to $60,000.  I ask George -

5    THE COURT:  Wait a minute, wait a minute.

6    MR. WIGGER:  Fifty-one, I had 51 two in my

7    -

8    THE COURT:  So you think, you say he stole

9    $60,000?

10   MR. WIGGER:  Yes.

11   THE COURT:  OK.

12   MR. WIGGER:  Yes.

13   THE COURT:  From the IRA account with the

14   value -

15   MR. WIGGER:  Yes.

16   THE COURT:  - of 134 or whatever?

17   MR. WIGGER:  Correct.

18   THE COURT:  OK.  I got it.

19   MR. WIGGER:  He took that money, he took it

20   without my permission.  He did so without my consent,

21   with, um, I don't know how many ways you can, you can

22   slice it down, um, George can't show that he had consent.

23   Then, um, I guess in closing on this, um, like I say, I

24   don't know how many different ways to say but, ah, he

25   never filed and income taxes form.  None, OK?  As a

*(From Videotape, 7-9-15, 8:33:58)*

1   durable power of attorney if he's gonna be taking money

2   out the least he could've done was file income tax

3   returns.  He's exposed me to unforseen tax liabilities

4   because of his actions.  His mother has exposed to tax –

5           MR. SYVER:  Objection.

6           MR. WIGGER:  – liabilities.

7           MR. SYVER:  Nothing came up about mom at

8   all and matter of fact he's admitted that he had no tax

9   liability on this as of yet.  Judge, it's evidence not

10  fair, he's testifying to evidence that hasn't been put

11  into evidence.  Things that haven't been put into

12  evidence.

13          THE COURT:  I agree.  I agree.

14          MR. WIGGER:  The judgment for divorce

15  stated that my wife was responsible for paying the taxes

16  out of that pension account for the money that I paid to

17  my parents totally $32,000.  That was never done, OK?

18  That was never done.  Somebody sent a tax return to the

19  prison and, I think, I believe in 2008 for the taxes for

20  2006.  We are not allowed to do tax returns.  We're not

21  allowed to have any kind of tax documents.  I can't even

22  possess a 1099, OK?  When he comes to talking about Terry

23  Drager, OK.  I wrote Terry Drager one time, she never

24  responded to me.  George come down on a visit and I asked

25  him about it.  George tells me Terry, she's not gonna

(From Videotape, 7-9-15, 8:33:58)

1  respond to you in prison.  I have when I, it took tooth

2  and nail for my mother to get the information, OK?

3  There's no way that I could ever get the information about

4  this.  Besides the fact George lied to me for almost ten

5  years and I had no reason.  George, every time George come

6  down I'd say, hey, George, how's my account doing?  He's,

7  oh, fine it's up to blah, blah, blah, he rolls out a

8  number, OK?  Well, after doing this, for his numbers, his

9  lies weren't adding up.  That is when I sent him a graph

10  in the mail for him to fill out, OK?  He don't remember

11  that.  He sends me back the perspectives with the numbers

12  on it.  Those number don't line up with the persepectives

13  and so that is when I wrote him and said, hey, there's a

14  $30,000 discrepancy between what you're telling me and

15  what my account should be.  That's when he wrote me the

16  letter.  That's the only reason he wrote me the letter.

17  He figured, well, OK, I'm gonna pass my dad by saying

18  well, I, I took 14 five but he knew darn well when that

19  letter was written he'd already peeled out 51,000, OK?  He

20  said he's sorry -

21              MR. SYVER:  Objection.

22              MR. WIGGER:  - because he, he knows -

23              THE COURT:  Well, hold on -

24              MR. WIGGER:  - didn't have permission.

25              THE COURT:  Things, ah, this is argument.

(From Videotape, 7-9-15, 8:33:58)

1  Overruled, Mr. Syver.  And for Mr. Wigger, you know I
2  didn't, I usually allow about 30 to 45 minutes for closing
3  and you're at about, you know, minute 37 so it's, I think
4  it's kinda time to wrap it up.
5          MR. WIGGER:  All right.  Can I wrap up by
6  asking, by stating what I wish the Court -
7          THE COURT:  Oh sure.
8          MR. WIGGER:  OK.  What I'm asking of the
9  Court is first of all I want the 51,200 back, OK?  The
10 money that was taken without permission.  I'm gonna ask,
11 I'm asking the Court for the $8,900 that I feel was taken
12 out of that (undistinguishable) I do not have yet have
13 proof of but I'm almost believe when George testified he
14 took that 7,500 out of my pension I honestly believe it
15 came out of the IRA.  I'm, I'm asking the Court for pre
16 and post filing interest of at least seven percent of the
17 maximum allowed by law.  I wanna ask the Court for
18 attorney, actual attorney fees, ah, right now that are in
19 over excess of 13,521.25.
20         THE COURT:  How'd you get that total?
21         MR. WIGGER:  That is from Mr. Vaneck's
22 bills.
23         THE COURT:  I haven't looked at it.  Was it
24 that much?  I didn't think it was that much.
25         MR. WIGGER:  Yup, all his bills totaled up

(From Videotape, 7-9-15, 8:33:58)

1  to 13,421.

2           MR. SYVER:  The Court refused to allow him

3  to amend his claim for attorney fees, judge.  It's res

4  judicata.

5           MR. WIGGER:  Then I'm gonna ask the Court

6  for costs.

7           THE COURT:  Let's let him wrap it up, Mr.

8  Syver.

9           MR. SYVER:  Yes, judge.

10          THE COURT:  OK.  Thanks.

11          MR. WIGGER:  My sister has expended a great

12  deal of money, um, my sister is actually, I owe my sister

13  close to $13,000 so far for the help that she's done for

14  me.  He, she's been using -

15          MR. SYVER:  Not an attorney, judge.

16          MR. WIGGER:  She's been using it -

17          MR. SYVER:  She's not entitled to it.

18          MR. WIGGER:  - so we have cost involved,

19  which my sister will provide an affidavit for.  I'm gonna

20  ask the Court for taxes and penalties in excess of 16,000.

21  I don't know what the tax liability's gonna be.  I don't

22  know what the IRS is gonna do.  I don't know if they're

23  gonna wait for me to get out of prison.  I wrote the IRS a

24  letter when they, when I got that tax return I wrote them

25  a letter.  I stated I'm in prison.  There is nothing I can

(From Videotape, 7-9-15, 8:33:58)

1    do.  I cannot file tax returns, I'm in prison.  Now –

2              THE COURT:·  Taxes ane penalties in the

3    amount of 16,000?

4              MR. WIGGER:  Yeah, that's if you just

5    figure just on the 51,000.  If you take 20% and 10% for

6    the penalty for early withdraw it gives you approximately

7    a 30% tax and penalty liability.

8              THE COURT:  OK.

9              MR. WIGGER:  Then I'm asking for triple

10   damages under 6002919a.  I'm asking for punitive damages

11   of 50,000.  George should, he should be punished for what

12   he done, OK?  That's what I'm asking (undistinguishable)

13   exemplory damages for all the stress and anxiety that he's

14   caused me.

15             MR. SYVER:  Judge, those are not

16   recoverable things in Michigan here.  Either one.

17             MR. WIGGER:  Then I would request –

18             THE COURT:  I, he's, I think he's right,

19   Mr. Syver.

20             MR. WIGGER:  Who's right, judge?

21             THE COURT:  Or Mr. Wigger, I think, Mr.

22   Wigger, that Mr. Syver's right.

23             MR. WIGGER:  OK.  I would request that the

24   Court order George to turn over all my personal documents,

25   such as my bank statements and my wallet, he says he don't

(From Videotape, 7-9-15, 8:33:58)

1  have it but my, all, any credit cards, my high school

2  diploma, my journeymen certificate, my military DD314, all

3  my court papers, he has my PSI, my transcripts, all of my

4  social security statements and any record of property

5  transfers, vehicle transfers and any such things that are

6  in my name including any remaining copies of his DPOA.

7  That's all property that belongs to me.

8               I would also seek an order from the

9  Court that would entitle me to an amended judgement to the

10 extent of any additional losses, (undistinguishable),

11 cost, expenses and attorney fees incurred by me that had

12 not yet been realized which such amounts to be established

13 by an affidavit of company and a motion for amended

14 judgement.  I'm also gonna request that the Court require

15 this judgement to be paid to a discretionary trust

16 account.  I cannot, any money that comes to me cannot,

17 money cannot come to me, OK?  This money's gotta go to my

18 sister.  My sister is my DPOA.  She is gonna set up a

19 discretionary trust.  That money, I need that money to be,

20 go into a discretionary trust.

21               MR. SYVER:  Judge, we'd object to that.

22               MR. WIGGER:  I cannot, I cannot -

23               THE COURT:  I understand, Mr. Syver.

24               MR. WIGGER:  I cannot take -

25               MR. SYVER:  Gotha.

(From Videotape, 7-9-15, 8:33:58)

1        MR. WIGGER:  - take in any money.  Then I'm
2    also gonna ask that the Court allow fees in, to allow me
3    to hire an attorney to ask as a possible receivership and
4    also for setting up the discretionary trust and to handle
5    any future things that are gonna come up in this case.
6    There's, this, this things far from over.

7        In closing, your honor, I just ask
8    that you use the law, common sense and your every day
9    experiences when you decide this case.  Thank you.

10        THE COURT:  Thank you.

11        MR. SYVER:  Judge, very briefly can we -

12        THE COURT:  No.

13        MR. SYVER:  I think we have to -

14        THE COURT:  Plaintiff gets the last word,
15    Mr. Syver.

16        MR. SYVER:  Judge, I believe that we have -

17        THE COURT:  And I think I told ya that that
18    was your only shot.

19        MR. SYVER:  I don't think you did, judge.

20        THE COURT:  Well, I remember I said -

21        MR. SYVER:  (Undistinguishable) -

22        THE COURT:  - you'll have to look at your
23    notes 'cause that was your closing argument.

24        MR. SYVER:  Plaintiff gets to say his
25    closing then we get to have ours, judge.

(From Videotape, 7-9-15, 8:33:58)

1      THE COURT:  Well, the plaintiff gets the
2  last word.
3      MR. SYVER:  Can I just have five, five
4  minutes?
5      THE COURT:  No.  No.  I told you earlier
6  that was, that was it.  That's why I gave you a chance to
7  look at your notes.
8      OK.  Mr. Kozal, let's take roll of the
9  exhibits.  Make sure we have 'em all here.  There's a
10  little bit of confusion because I made this list and not
11  all those things were admitted.  Now, Mr. Kozal, we should
12  have exhibit number two.
13      THE CLERK:  Yes.
14      THE COURT:  Four?
15      THE CLERK:  Four.
16      THE COURT:  Five?
17      THE CLERK:  Five.
18      THE COURT:  Nine A.
19      THE CLERK:  (Undistinguishable).
20      THE COURT:  Nine A was the paycheck, one
21  page.  Copy of a paycheck.
22      THE CLERK:  (Undistinguishable) plaintiff's
23  exhibit nine?
24      THE COURT:  Yes, they're all gold stickers.
25      THE CLERK:  No.

*(From Videotape, 7-9-15, 8:33:58)*

1      THE COURT:  All right.  Kevin, do you have

2  nine A?

3      MR. WIGGER:  I have copies.  Um -

4      THE COURT:  Well, I'm looking for the one

5  that has the -

6      MR. WIGGER:  I have, I believe -

7      THE COURT:  - big gold sticker.

8      MR. WIGGER:  - I do have one.  One second.

9      THE COURT:  You guys might wanna both keep

10  your files open for a moment.

11      MR. WIGGER:  Yup.  It was exhibit nine?

12      THE COURT:  Nine A.

13      MR. WIGGER:  Yup.

14      THE COURT:  OK.  Thank you.

15      MR. WIGGER:  That's the, ah, I'm still

16  questioning the fact that because when I had presented

17  that, that other check should've been attached to it.

18      THE COURT:  Well, we're done, Kevin.

19      MR. WIGGER:  OK.

20      THE COURT:  I detached those and nine A's

21  in.

22      THE CLERK:  So is nine.

23      THE COURT:  OK.  Well, I make it nine A.  I

24  thought we did this already.  OK.  So we got a copy of

25  nine A?

(From Videotape, 7-9-15, 8:33:58)

1      THE CLERK:  Correct.

2      THE COURT:  Ten?

3      THE CLERK:  Ten.

4      THE COURT:  Thirteen?

5      THE CLERK:  Thirteen.

6      THE COURT:  Fourteen?

7      THE CLERK:  Fourteen.

8      THE COURT:  Fifteen?

9      THE CLERK:  Fifteen.

10     THE COURT:  Sixteen?

11     THE CLERK:  Sixteen.

12     THE COURT:  Seventeen?

13     THE CLERK:  Seventeen.

14     THE COURT:  Eighteen?

15     THE CLERK:  Eighteen.

16     THE COURT:  Twenty-one?

17     THE CLERK:  Twenty-one.

18     THE COURT:  And then 21a I think is a,

19   stapled to the end of that.  That's the commissary stuff.

20     THE CLERK:  Twenty-one and then 21a would

21   be the one with the green (undistinguishable), correct.

22     THE COURT:  All right, 24?

23     THE CLERK:  Twenty-four.

24     THE COURT:  Twenty-six?

25     THE CLERK:  Twenty-six.

(From Videotape, 7-9-15, 8:33:58)

1     THE COURT:  Twenty-seven?

2     THE CLERK:  Twenty-seven.

3     THE COURT:  (Undistinguishable) do we have

4  26a?

5     THE CLERK:  I have 26a stapled to 26.

6     THE COURT:  All right.  And do you have 27a

7  stapled to 27?

8     THE CLERK:  Correct.

9     THE COURT:  Twenty-eight?

10     THE CLERK:  Twenty-eight.

11     THE COURT:  Twenty-nine?

12     THE CLERK:  Twenty-nine.

13     THE COURT:  Thirty?

14     THE CLERK:  Thirty.

15     THE COURT:  And that's it for the

16  plaintiff.  And then on the defense side we should have A.

17     THE CLERK:  A

18     THE COURT:  OK.  Looks like we have through

19  A.

20     THE CLERK:  A, B, C.

21     MR. SYVER:  You have an L too.

22     THE CLERK:  D.  E, F, G, H, I, J, K, L,

23  well, K was actually marked as plaintiff's K.  I can

24  change it to a blue tag.

25     THE COURT:  Let's do that.  Put it on a

(From Videotape, 7-9-15, 8:33:58)

1    blue tag.

2                        THE CLERK:  And, ah, L1.

3                        THE COURT:  OK.  So, well, L has a bunch of

4    pages.  I think we're all the way up to, like 31 or

5    something.

6                        THE CLERK:  (Undistinguishable).

7                        MR. SYVER:  Thirty-one.

8                        THE CLERK:  L1 through L3.

9                        THE COURT:  All right.  Let me see K for

10   just a minute.  All right.  So, L is the series of

11   receipts and K is the handwritten, ah -

12                        THE CLERK:  Summary.

13                        THE COURT:  - summary from George.  OK.

14                        THE CLERK:  Thirty, 30, 31, 32 can be

15   returned to -

16                        THE COURT:  Let me see.

17                        THE CLERK:  - Kevin.

18                        THE COURT:  No, 30's admitted.

19                        THE CLERK:  (Undistinguishable).

20                        THE COURT:  All right.  Well, you know

21   what, Mr. Kozal's showing me 31 and 32.  Thirty-one is -

22                        THE CLERK:  Actually I have 30.

23                        THE COURT:  Well, hold on.

24                        THE CLERK:  Duplicate number, or maybe

25   that's the 36.  Nope.

(From Videotape, 7-9-15, 8:33:58)

1    THE COURT:  No, OK.  Well, we got a couple
2    problems here.  We've got two that have number 30.  The
3    number 30 that I think that we've admitted were the
4    answers to the interrogatories so earlier, I think, Kevin,
5    you had tried to introduce the electrical permit taken up
6    by Mr. Arvey.
7         MR. WIGGER:  Last week.
8         THE COURT:  Well, I know, I don't think we
9    -
10        MR. WIGGER:  Yeah, yeah, but I think you're
11   right.  You handed that back to me.
12        THE COURT:  Right.  So let's, let's hand
13   that back.  And then I have 31 and 32, which I think were
14   admitted.  Thirty-one is the RV tear off and re-roof
15   building permit and 32 was, ah, window size and reside.
16   Mr. Syver, what do your notes show?
17        MR. SYVER:  That's what I was just looking
18   for real quick, judge.  I think I have 'em right here.
19   Are you talking about on the end because on -
20        THE COURT:  Third -
21        MR. SYVER:  - end I have discovery
22   responses were as number 30.
23        THE COURT:  Right.
24        MR. SYVER:  And that's where we stopped.
25        THE COURT:  Yes, I'd have to go back and -

(From Videotape, 7-9-15, 8:33:58)

1    MR. SYVER:  The discovery responses had

2 only question four and 16 and I don't remember them

3 coming, being admitted but they were talked about.

4    THE COURT:  All right.  Well, I think I

5 admitted those, ah, number 30 but the only one I'm a

6 little unclear about were 31 and 32.  I will say this -

7    MR. SYVER:  What were 31 and 32, judge?

8    THE COURT:  Building permits.

9    MR. SYVER:  Building permits.

10    THE COURT:  By the later owner.

11    MR. SYVER:  I don't remember -

12    THE COURT:  Arvey.

13    MR. SYVER:  - came and what didn't.

14    THE COURT:  All right.

15    MR. SYVER:  I do know that the one building

16 permit by Mr. Wigger, Kevin, did come in.  I don't think

17 we allowed the other two.

18    MR. WIGGER:  See and that's, that's what -

19    MR. SYVER:  I don't know.

20    MR. WIGGER:  I have some confusion because

21 it's the one I took out in 2005 that I cannot find but we,

22 we -

23    THE COURT:  Well, we're not talking about

24 that, we're not talking about the one that you took out in

25 2005.

(From Videotape, 7-9-15, 8:33:58)

1    MR. WIGGER:  Right.  Well, that's what he

2  just said –

3    THE COURT:  Right.

4    MR. WIGGER:  – was admitted.

5    THE COURT:  So that, that's not an issue.

6    MR. WIGGER:  Those two were admitted –

7    THE COURT:  Last week –

8    MR. WIGGER:  – (undistinguishable).  Yeah.

9    THE COURT:  – on the 30th –

10    MR. WIGGER:  Yeah.

11    THE COURT:  – had three building permits.

12    MR. WIGGER:  Yes.

13    THE COURT:  What I'll have, what I may have

14  to do is go back and look at it but I, there is a note on

15  these two, both that relate to Mr. Arvey that suggest that

16  I admitted 'em so I'm, we should, you guys should add 31

17  and 32 to your list.  And I will double check those.

18    All right.  Gentlemen, the Court's

19  denying the so called directed verdict motion for the

20  reason that are indicated in the opinion that will be

21  coming in here in about 30 second and then the ultimate

22  decision on the case the Court will certainly need to go

23  through notes, go through the exhibits and will render a

24  written opinion on that.  Mr. Wigger, do you have any

25  questions?

(From Videotape, 7-9-15, 8:33:58)

1    MR. WIGGER:  Um, no, your honor.

2    THE COURT:  Mr. Syver?

3    MR. SYVER:  Just, judge, I know you're

4    gonna write an opinion.  Can you tell us where we're at?

5    THE COURT:  No.

6    MR. SYVER:  OK.

7    THE COURT:  Well, there's a lot going on

8    here.  I mean, I, I have some, ah, assessment done but I

9    think it's always good to step back and make sure you

10    haven't missed anything.

11    MR. SYVER:  OK.  Will the Court -

12    THE COURT:  All right.

13    MR. SYVER:  - be taking pictures of the two

14    boards to help him, to help the Court make decisions?

15    THE COURT:  Yes.  After you guys leave

16    that's what I'll do.

17    MR. SYVER:  May I take pictures of 'em?

18    THE COURT:  Sure.

19    MR. SYVER:  Thank you, judge.

20    THE COURT:  Sure.  And thanks once again to

21    the officers.  Thank you.  Appreciated your timeliness and

22    professionalism.  And nobody's got any of my books, right?

23    MR. WIGGER:  Nope.  Did you find your

24    evidentiary book that you had had earlier?

25    THE COURT:  No, I didn't but I'm not gonna

(From Videotape, 7-9-15, 8:33:58)

1   blame you for it anymore.  I'll be looking at some other

2   suspects.  All right.  And, Mr. Kozal's gonna hand out

3   that directed verdict opinion right now.  Thank you very

4   much.

5                    (Court in recess at 4:59:50)

6                            -oOo-

(From Videotape, 7-9-15, 8:33:58)

STATE OF MICHIGAN          )

                           )     SS

COUNTY OF MUSKEGON         )


     I, certify that this transcript, consisting of 302 pages
is a complete, true, and correct transcript of the videotaped
proceedings and testimony taken in WIGGER V WIGGER 14-49481-CZ
on July 9, 2015, Videotaped.

*\*Please note proper names and/or case names unknown to this
reporter are spelled phonetically and may not be correct.*


                              *Bobbie Springer*
                              _____
                              Bobbie Springer
                              Certified Court Recorder 3408
                              Notary Public, Muskegon County,MI
                              My Commission Expires: 03-03-20


*Mills Court Reporting,   1615 Sunset, N Muskegon, MI 49445   231-744-6823*

302