UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

GEORGE R. WIGGER,

      Debtor.

_____/

THOMAS A. BRUINSMA, CHAPTER 7 TRUSTEE
FOR KEVIN MARK WIGGER,

      Plaintiff,

vs.

GEORGE R. WIGGER,

      Defendant.

_____/

GEORGE R. WIGGER,

      Counter-Plaintiff,

v.

KEVIN MARK WIGGER,

      Counter-Defendant.

_____/

Case No.  BG 15-06752
Chapter 7

Adversary Proceeding
No. 16-80049

## **OPINION REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

Appearances:

Jacqueline M. Appleman, Esq. and Harold E. Nelson, Esq., attorneys for Thomas A.
    Bruinsma, Chapter 7 Trustee for Kevin M. Wigger, the Plaintiff.

Cody H. Knight, Esq., attorney for George R. Wigger, the Debtor, Defendant and Counter-
    Plaintiff.

Kevin M. Wigger, pro se Counter-Defendant.

I.   INTRODUCTION and JURISDICTION.

This adversary proceeding arises from allegations that George Wigger embezzled or converted funds from his father, Kevin Wigger, acting pursuant to a durable power of attorney while Kevin was incarcerated.[1]  Kevin sued George in the Muskegon County Circuit Court and obtained a $64,812.52 judgment against George for statutory conversion.  Shortly thereafter, George filed a voluntary chapter 7 petition in this court. Kevin, the original plaintiff in this adversary proceeding, filed a pro se complaint asserting that the judgment debt be should excepted from George's discharge and requesting additional nondischargeable damages beyond those awarded under the state court judgment.

The matter is currently before the court on cross motions for summary judgment. Kevin filed his motion for summary judgment on March 1, 2017 (AP Dkt. No. 116), and George filed a cross motion for summary judgment on May 18, 2017 (AP Dkt. No. 120). After the motions were filed, but prior to the scheduled hearing, Kevin Wigger filed his own chapter 7 bankruptcy case.  Thomas A. Bruinsma was appointed as the trustee in Kevin's case, and was substituted as the Plaintiff in this adversary proceeding (see AP Dkt. No. 139).[2]  On March 30, 2018, the Trustee filed a supplemental memorandum of law in support of Kevin's motion for summary judgment.

---

[1]     To avoid confusion, the court has continued the practice utilized by the Muskegon County Circuit Court and has referred to the parties by their first names.  George Wigger is also referred to herein as the "Defendant."

[2]     Thomas A. Bruinsma is referred to herein as the "Plaintiff" or the "Trustee."

2

Kevin's motion for summary judgment, as adopted by the Trustee in his supplemental briefing,[3] asserts that the state court judgment debt should be nondischargeable pursuant to § 523(a)(4) and § 523(a)(6) of the Bankruptcy Code.[4] This argument is based, at least in part, on the collateral estoppel effect of the state court judgment. The Trustee also asserts that George made additional wrongful withdrawals totaling $18,575.00, which were only discovered by Kevin after the conclusion of the state court bench trial. The Trustee's supplemental brief argues that George is indebted to Kevin for these additional withdrawals, which were not included in the prior state court judgment, and that this debt should also be excepted from George's discharge under § 523(a)(4) and (6).

The Defendant's motion for summary judgment asserts that the Plaintiff has failed to establish the requisite elements of his § 523(a)(4) and (6) causes of action. The Defendant also argues that the Plaintiff's claims for additional damages, beyond those included in the state court judgment, are barred by the doctrine of res judicata. Finally, the Defendant suggests that the Plaintiff is not entitled to equitable relief, including a nondischargeability determination, because of Kevin's "unclean hands."

---

[3]   The Trustee's Supplemental Memorandum of Law (AP Dkt. No. 141, cited herein as "Trustee's Supplemental Brief"), did not address the § 523(a)(6) count of the complaint. However, Kevin Wigger's original Motion for Summary Judgment (AP Dkt. No. 116) and the Trustee's Second Supplemental Memorandum of Law (AP Dkt. No. 143, cited herein as "Trustee's Second Supplemental Brief") both argue that summary judgment should be granted under § 523(a)(6).

[4]   The Bankruptcy Code is set forth in 11 U.S.C. §§ 101-1532 inclusive. Specific provisions of the Bankruptcy Code are referred to in this opinion as "§ ___."

A hearing on the motions for summary judgment was held before this court on May 10, 2018.   After the hearing, each party submitted a supplemental brief.[5]   The court subsequently ordered the Defendant to provide additional documentation from the state court record.  The Defendant filed those supplemental documents on August 23, 2018.[6]

The court has jurisdiction over this bankruptcy case.   28 U.S.C. § 1334.   The bankruptcy case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a); L. Civ. R. 83.2(a) (W.D. Mich.).   This nondischargeable debt action is a statutory core proceeding.  28 U.S.C. § 157(b)(2)(I).  The court has authority to enter a final order in this adversary proceeding.

## II.   FACTUAL BACKGROUND.

Many of the facts that are material to this adversary proceeding were previously established in state court litigation.  They are primarily set forth in the state court's Opinion and Order after Bench Trial and Opinion and Order regarding Summary Disposition Motions, which both parties have incorporated as part of the summary judgment record before this court.[7]  Those undisputed material facts are summarized below.

On or about June 2006, Kevin Wigger granted his son George a Durable Power of Attorney to manage Kevin's finances and assets.  (See Opinion after Trial, at 3.)  At that

---

[5]     See Supplemental Brief in Support of Debtor's Motion for Summary Judgment (AP Dkt. No. 142) (cited herein as "Debtor's Supplemental Brief"); Trustee's Second Supplemental Brief (AP Dkt. No. 143).

[6]     See George R. Wigger's Supplement to Summary Judgment Record (AP Dkt. No. 150).

[7]     The Muskegon County Circuit Court's Opinion and Order after Bench Trial is attached to the Trustee's Second Supplemental Brief as Exhibit 1 and the Debtor's Supplemental Brief as Exhibit D.  This document is cited herein as the "Opinion after Trial."
        The Circuit Court's Opinion and Order regarding Summary Disposition Motions is attached to the Debtor's Supplemental Brief as Exhibit C.  It is cited herein as the "Opinion on Summary Disposition."

time, Kevin Wigger was incarcerated in the Muskegon County Jail.  (Id.)  The Durable Power of Attorney (sometimes referred to herein as the "DPOA") gives George broad authority to "act in, manage, and conduct" all of Kevin's affairs, "as [his] agent" for Kevin's "use and benefit."  (Debtor's Supplemental Brief, Exh. A; Trustee's Second Supplemental Brief, Exh. 3.)  The DPOA specifically authorizes George to undertake fourteen different categories of actions on Kevin's behalf, including buying and selling property, and making "deposits or investments in or withdrawals from, any account, holding, or interest" which Kevin had or acquired "in any banking, trust, or investment institution."  (Id. at 1-2.)

The Defendant has suggested that Kevin executed the DPOA because he wanted to hide his assets from the State of Michigan during his incarceration.  In support of this assertion, the Defendant points to a statement in the Opinion after Trial, wherein the court notes that "Kevin is not a sympathetic figure, with his criminal past and motivation to keep his money situation hidden from federal and state authorities."  (Opinion after Trial, at 14.)  The Defendant also offered a sworn declaration, stating that his father, Kevin, told him "that he wanted to hide his assets from the State of Michigan."  (Debtor's Supplemental Brief, Exh. F.)  The Trustee disputes this allegation, pointing out that the state court also found that Kevin's criminal conviction was not relevant to the issues before it.  (Opinion after Trial, at 2.)

In August 2012, George wrote a letter to Kevin stating that he used the DPOA to "borrow" $14,500 from Kevin in July 2007 to "get [his] house."  (Opinion on Summary Disposition, at 1; Opinion after Trial, at 10.)  George apologized for doing this and promised to pay Kevin back.  (Id.)  The letter caused Kevin to investigate.  (Opinion on Summary Disposition, at 1.)  According to Kevin, his investigation revealed that George

5

had made numerous withdrawals from Kevin's IRA account for his own personal use. (Id. at 1-2.)

Kevin filed a complaint against George and George's wife, Alyssa, in the Muskegon County Circuit Court. The Fourth Amended Complaint contained counts for fraudulent conversion, breach of contract, fraud, and constructive trust. (See Debtor's Supplemental Brief, Exh. B.) It alleged that George's improper withdrawals from the IRA account began on April 2, 2007 and continued through August 12, 2010 and that the total amount of the withdrawals was $51,200. (Id. at 4-9.)

Motions for summary disposition were filed, and on June 4, 2015, the state court issued its Opinion on Summary Disposition. The state court dismissed the breach of contract count, because it found that no contract existed between Kevin and George. (Opinion on Summary Disposition, at 10.) It dismissed the fraud count because it concluded that the elements of fraud were not established, in part because Kevin "willingly gave George access to the money." (Id. at 12.) It also dismissed the constructive trust count, finding that imposition of a constructive trust was "an equitable remedy," not an "independent cause of action." (Id. at 13.) However, the state court denied George's motion as to the fraudulent conversion count. It also partially granted Kevin's cross motion for conversion of $14,500, based on George's admission in his August 2012 letter that he had withdrawn this amount from the IRA. The court declined to enter judgment immediately, finding instead that trial testimony would be required to "characterize the nature of the judgment" and "consider Kevin's request for derivative damages." (Id. at 13.)

A trial was held in the state court on June 24, 25, 30, and July 9, 2015.  On July 16, 2015, the state court entered its Opinion and Order after Bench Trial.  The state court opinion begins by noting some of the difficulties the parties and the court had encountered as a result of Kevin's decision to represent himself in the litigation while incarcerated. (Opinion after Trial, at 1-2.)  For example, the court explained that Kevin had contacted court staff after conclusion of the trial but prior to entry of the opinion, to advise the court that he had "finally received" additional bank records subpoenaed during trial.  (Id. at 1.) The court stated its belief that it had handled the subpoena issues raised by Kevin, and the overall scheduling of the trial, in a way that "fulfilled its obligations to him."  (Id. at 2.) The court further explained that Kevin had "represented himself well," although it noted that his decision to proceed without counsel had "hindered him at certain points," particularly with respect to the subpoena issues. (Id.)

The state court opinion goes on to indicate that, as of the time of trial, the only remaining count of Kevin's complaint was entitled "fraudulent conversion."  (Id. at 5.) Although Kevin's complaint used the term "embezzlement" in several contexts, the court declined to construe the complaint as directly alleging a separate embezzlement count. (Id. at 5-6.)  However, because the complaint included a citation to Mich. Comp. Laws § 600.2919a, the court construed the complaint as including a claim for "statutory conversion."  (Id.)  In its findings and conclusions, the state court opinion uses the terms embezzled and converted almost interchangeably.

The state court opinion laid out a general timeline of the events in the case.  It noted that Kevin purchased a "starter" house on Third Street[8] for George sometime in

---

[8]     The state court opinion does not give the full address for the Third Street house. Presumably, it was located in or near Muskegon, Michigan.

7

2003, and that George claimed to have performed a lot of work on the house in 2005 and 2006.  (Id. at 3.)  The house was sold in June 2007, and George and his wife purchased a different home on Carr Road, in Muskegon, Michigan, in July 2007.  (Id.)

The state court also found that George made fifteen withdrawals from Kevin's IRA account between April 2, 2007 and August 12, 2010.  (Id. at 3-4.)  The total amount of these withdrawals was $51,200.  The state court opinion recognized that George was acting pursuant to the DPOA when he made these withdrawals and at all other relevant times.  It noted that George, "to his credit," admitted withdrawing $51,200 from the IRA account.  (Id. at 7.)  George also "conceded that not all of the withdrawals were spent on the house," and alleged that Kevin had given him permission to borrow other amounts. (Id. at 4.)   In summary, the court explained that "[m]uch of the case turns on the instructions Kevin gave George about how to manage the money and other items identified in the DPOA."  (Id. at 7.)

The balance of the state court opinion attempts to reconcile the conflicting evidence and testimony presented by the parties on this point.  The court noted, for example, that Kevin, in his judgment of divorce from George's mother, had promised to pay George $15,000 when the Third Street house was sold.  (Id. at 7.)  Other correspondence from Kevin to George gave George "permission to borrow money, but ask[ed] him to keep track of it."  (Id. at 7-8.)

For his part, George asserted that the money withdrawn from the IRA was spent on the Third Street house.  The court noted, however, that George was never able to provide Kevin with a "comprehensive tally" of the "sums he spent on the house."  (Id. at

9.) Based on this, and other inconsistencies in George's testimony, the court concluded that George converted the money that was entrusted to him.

The court made its most specific findings regarding George's conversion of the $14,500 he admitted to "borrowing" from his father in July 2007. The court quoted the August 2012 letter, in which George stated:

> I want to say sorry I borowed (sic) 14,500 from you in July of '07 to get my house. I didn't want to say anything. I didn't want you to get mad. I am going to pay you back when I get enuff (sic) equity in my house. I didn't realy (sic) have a choice. I needed to get a house. I was not going to buy that house from mom for 126,000. I had to pay some debt and put some on the house again I am sorry I pulled my power of attorney so I cant (sic) toch (sic) that moneny (sic).

(Id. at 10.) The court concluded that the "thrust of this letter" was that "George took the money, knew it was wrong, and promised to make it right." (Id.) According to the court, this conclusion was only bolstered by George's trial testimony, in which he admitted borrowing the money due to the financial stress he was under at the time and explained that he was ashamed of his actions. (Id.) The state court further held that the wording of George's letter established that this $14,500 withdrawal was "in no way connected to the $15,000 George did not receive in the judgment of divorce, or to amounts he had invested in the Third Street property." (Id. at 10.)

Ultimately, the court held that George had "embezzled or converted certain of the sums" that Kevin had entrusted to him under the DPOA. (Id. at 10.) In support of this conclusion, the court stated:

> There are several plausible explanations for George's conversion of the money entrusted to him. The first is that he may have had a fundamental misunderstanding . . . about what the DPOA allowed him to do. Simply, the DPOA was not a gift to him.

9

> Most people who misuse others' money, in this judge's experience, start with a fairly innocuous withdrawal and some intent to pay that money back. (Kevin's various communications may have created some of this.) However, when the first withdrawal is not detected, it becomes easier to do it a second, third, or fourth time.  Perhaps the temptation here was simply too much for George.  He admitted he was under financial pressure for much of this time.
>
> He also seemingly presumed or gambled that his father would not respond as he has . . . However, these are choices George made, and he has lost that gamble.

(Id. at 13-14.)

The court found that Kevin was entitled to damages in the amount of $51,200, plus an extra $2,000 George converted from Kevin's last paycheck and his employer's purchase of his tools, less $15,000 which was promised under the Judgment of Divorce and which was the "amount Kevin agrees George's work [on the Third Street house] was worth." (Id. at 13-15.)  Based on these figures, the court concluded that the net amount of compensatory damages owed by George to Kevin was $38,200.  (Id. at 15.)

The court declined to exercise its discretion to award treble damages under Mich. Comp. Laws § 600.2919a for several reasons.  (Id. at 15-16.)  First, it explained that "Kevin's instructions about how and when to use this money were vague and ambiguous." (Id. at 16.)  Second, it noted that "George did perform many tasks for his father."  (Id.) Finally, it stated that George did have some "claim of right" to a $15,000 payment relating to the house on Third Street and the Judgment of Divorce.  (Id.)

The state court also noted that Kevin had requested several other types of damages for which the evidence at trial was insufficient to grant a judgment.  (Id. at 15.) For instance, in his closing argument, Kevin argued that he may have sustained additional damages for "penalties and interests" due to the withdrawals George made.  (Id.)  The

court held that Kevin presented no numbers on this issue "from which the court [could] set a judgment amount." (Id.)  The court found, however, the Kevin was entitled to recover certain attorney's fees, transportation costs, other "routine" court costs, and statutory interest.  (Id. at 17.)  The court invited Kevin to submit follow up documentation regarding these amounts.  (Id.)

After entry of the Opinion after Trial, Kevin filed a Motion for Entry of Judgment and brief in support of the motion on September 21, 2015.[9]  (See Debtor's Supplement to Summary Judgment Record, AP Dkt. No. 150, at Exh. B.)   Despite the state court's prior findings about the damages to which he was entitled, Kevin's motion requests total damages of over $420,000.  This request included $51,200 for the withdrawals from April 2, 2007, to August 12, 2010; $18,575.00 for "Additional amounts embezzled;" $270.00 for "Wire transfer fees;" $29,092.15 for "Costs incurred from withdrawals;" nearly $300,000 in treble damages; and other alleged attorney's fees and costs.  (Id.)  An appendix to Kevin's brief shows that the "Additional amounts embezzled" refers to "newly found" withdrawals alleged to have occurred in 2011 and 2012.  (Id. at Appendix A.)[10]  Of the $270.00 in "Wire transfer fees" requested by Kevin, the appendix clarifies that $180.00 pertained to the 2007-2010 withdrawals, and $90.00 related to the 2011-2012 withdrawals.   Similarly, the "Costs incurred from withdrawals" applied to both the previously litigated and the newly alleged withdrawals:  $22,694.31 from the 2007-2010 withdrawals, and $6,397.84 from the 2011-2012 withdrawals.

---

[9]      According to the Order Entering Judgment, Kevin's motion was "revised" on October 13, 2015.  The revised motion is not part of the summary judgment record before this court.

[10]      Appendix A was reproduced in Kevin's amended complaint in this adversary proceeding. (See Adversary Complaint, AP Dkt. No. 10, at 3.)  The calculations reflected in the appendix continue to form the basis for the damages requested in this adversary proceeding.

11

On November 4, 2015, the state court entered a judgment in favor of Kevin and against George in the total amount of $64,812.52. (See Trustee's Supplemental Brief, at Exh. 2.) Consistent with the findings regarding damages in the Opinion after Trial, the judgment amount was comprised of $38,200.00 in damages, $5,477.59 in Michigan Department of Corrections transportation costs, $13,684.58 in attorney's fees,[11] $1,301.72 in other fees, and $6,148.63 in statutory interest. (Id. at 1.) In the Order Entering Judgment, the state court specifically denied Kevin's motion "to the extent that it seeks to interject other alleged withdrawals (after 2010) that were not litigated in the trial." (Id. at 2.)

After entry of the judgment, Kevin filed several post-judgment motions in the state court, including a Motion for New Trial, Motion to Re-Open Discovery and Motion to Amend Complaint. (See Debtor's Supplement to Summary Judgment Record, AP Dkt. No. 150, at Exh. C, D and E.) The state court denied these motions in an order entered on November 20, 2015. (See Debtor's Supplement to Summary Judgment Record, AP Dkt. No. 150, at Exh. G) (sometimes referred to herein as "Order Denying Post-Judgment Motions.") The order noted that many of the claims raised in Kevin's post-judgment motions were "simply requests for a 'do-over' of the trial already conducted." (Id. at 2.) The court opined that "[t]o the extent that Kevin has viable claims which were not presented in the first case" he might have other available options "subject to principles of res judicata and collateral estoppel." (Id.) The state court concluded that its order "does not, by itself, bar Kevin from filing a new lawsuit" but "neither is it a finding that he can properly do that." (Id. at 3.)

---

[11]    The order explains that this amount "represents the total amount billed by Kevin's former attorney, Mr. Van Eck, before his withdrawal from the case." Id. at 1, n.1.

12

George filed his chapter 7 case on December 15, 2015. Kevin initiated this adversary proceeding on February 22, 2016. His amended complaint[12] asserts that the damages awarded under the state court judgment should be nondischargeable under § 523(a)(4) and (6). Kevin's amended complaint also seeks a judgment from this court for the additional withdrawals from his IRA account he claims to have discovered after conclusion of the state court trial. Those withdrawals, which occurred between March 6, 2011 and March 26, 2012, total $18,575.00. Kevin asserts that any judgment for these amounts should also be nondischargeable under § 523(a)(4) and (6).[13]

## III.   ISSUES.

The issues presented in this adversary proceeding are as follows:

1.   Is the prior judgment entered by the Muskegon County Circuit Court entitled to res judicata, or claim preclusive, effect on the issue of the validity, extent, and amount of the debt owed by George to Kevin? If so, does the prior state court judgment

---

[12]   The amended complaint included nine counts and sought relief not only against George, but also against several third parties. The third parties were dismissed pursuant to an order entered on September 13, 2016. (AP Dkt. No. 60.)

Per the consent of the parties, the court limited the issues in this adversary proceeding to those set forth in the First Pretrial Order. (See First Pretrial Order, AP Dkt. No. 77.) Specifically, the court has construed the amended complaint as requesting a determination that the prior judgment debt be excepted from discharge under § 523(a)(4) and (6). (Id. at Issues, ¶ 1-2.) The court has considered the additional counts – statutory conversion (Count I), embezzlement (Count II), fraudulent concealment (Count III), silent fraud (Count IV), breach of fiduciary duty (Count V) – as requests for a determination that Kevin is owed an additional nondischargeable debt for the 2011 and 2012 withdrawals. (Id. at Issues, ¶ 3-4.)

[13]   Kevin's adversary complaint asserts that George's wrongful withdrawals caused him to incur additional wire fees totaling $270 and "losses and costs" totaling $29,092.15. To the extent these damages related to the withdrawals addressed in the prior state court litigation, such damages were not included in the state court judgment.

The Trustee has not requested these additional damages in his Second Supplemental Memorandum of Law. Even if the Trustee were to seek these additional amounts, his claims would be barred under principles of res judicata for the reasons stated in Section IV.C of this opinion.

preclude the Plaintiff from asserting claims for additional damages in this adversary proceeding?

2.  Is the prior state court judgment entitled to collateral estoppel, or issue preclusive, effect on the issue of the dischargeability of the judgment debt? If so, do the state court's findings of fact and conclusions of law establish that the judgment debt, or some portion thereof, should be excepted from discharge in George's bankruptcy case because the debt resulted from embezzlement under § 523(a)(4), defalcation in a fiduciary capacity under § 523(a)(4), or willful and malicious injury under § 523(a)(6)? Are the Plaintiff's nondischargeable debt causes of action barred under the unclean hands doctrine?

## IV.  DISCUSSION.

### A.  Summary Judgment Standard.

Bankruptcy Rule 7056, which incorporates Federal Rule of Civil Procedure 56, states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Bankr. P. 7056(a). When considering a motion for summary judgment, the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986). All facts and related inferences are to be viewed in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255, 106 S. Ct. at 2513.

Further, when a court reviews cross-motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most

favorable to the nonmoving party."  Wiley v. United States, 20 F.3d 222, 224 (6th Cir.

1994).  Denial of one party's motion for summary judgment does not automatically compel

the conclusion that the other party is entitled to summary judgment.  B.F. Goodrich Co. v.

United States Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001).

    B.  Preclusive Effect of State Court Judgment:  General Framework.

    Many of the issues presented in this adversary proceeding were thoroughly and

exhaustively litigated in the prior state court action and were determined in the state court

judgment.  Both parties have argued that the findings of fact and conclusions of law in the

state court opinion and judgment are entitled to preclusive effect in this

nondischargeability proceeding, under the doctrines of collateral estoppel, also referred

to as issue preclusion, or res judicata, sometimes referred to as claim preclusion.[14]  The

parties differ, however, in their views of how these preclusion principles should be applied

and what conclusions they compel regarding the dischargeability of the judgment debt

and the Plaintiff's ability to assert claims for additional damages in this adversary

proceeding.

    When a bankruptcy court is called upon to determine the preclusive effect of a prior

judgment in a subsequent proceeding to except the debt from discharge, it is helpful to

---

[14]    As explained by the United States Supreme Court:

Claim preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.  Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim.

New Hampshire v. Maine, 532 U.S. 742, 748-49, 121 S. Ct. 1808, 1814 (2001).

consider the nondischargeable debt action as being comprised of two separate, but related, determinations:  one regarding the existence, validity, and amount of the debt and a second regarding whether the debt is dischargeable.  Sill v. Sweeney (In re Sweeney), 276 B.R. 186, 195-96 (6th Cir. B.A.P. 2002) (because the dischargeability of a debt is "a matter separate from the merits of the debt itself" a dischargeability action encompasses "two distinct claims" – whether a debt is owed and whether it is dischargeable) (quoting Jorge v. Mannie (In re Mannie), 258 B.R. 440, 444-45 (Bankr. N.D. Cal. 2001)); see Longo v. McLaren (In re McLaren), 3 F.3d 958, 965-66 (6th Cir. 1993) ("the bankruptcy court has jurisdiction to adjudge the validity and amount of a claim together with its dischargeability").  In instances where a prior judgment has been entered, the bankruptcy court may not be required to make the first of these determinations because the existence and amount of the debt is established by the prepetition judgment. Ingham County v. Strojny (In re Strojny), 337 B.R. 150, 156 (Bankr. W.D. Mich. 2006). Assuming other prerequisites for application of res judicata are met, the prior determination regarding the existence and amount of the debt will be entitled to preclusive effect in the nondischargeability proceeding.  Matter of Redburn, 193 B.R. 249, 258 (Bankr. W.D. Mich. 1996) (noting that a prior state court judgment is entitled to res judicata effect as to the *amount* of the debt) (citing Rally Hill Prods., Inc. v. Bursack (In re Bursack), 65 F.3d 51, 53 (6th Cir. 1995)) (additional citations omitted) (emphasis in original).

By contrast, the second determination as to whether a particular debt should be excepted from discharge under § 523(a)(2), (4) or (6) "is a legal conclusion which is within the exclusive jurisdiction of the bankruptcy courts."  McCurdie v. Strozewski (In re Strozewski), 458 B.R. 397, 403 (Bankr. W.D. Mich. 2011) (citing 11 U.S.C. § 523(c)).

Accordingly, res judicata "does not bar the bankruptcy court from deciding the issue of whether a debt is dischargeable, even when similar issues have already been decided by a state court of competent jurisdiction."  Id. (citing Brown v. Felson, 442 U.S. 127, 138-39, 99 S. Ct. 2205, 2212-13 (1979) (holding that bankruptcy courts are not bound by res judicata when considering the dischargeability of a debt)) (additional citations omitted); see also The Collision Shop of America, Inc. v. Maurer (In re Maurer), 489 B.R. 64, 65 (Bankr. E.D. Mich. 2013) (collecting cases supporting the proposition that "the doctrine of res judicata does not bar a nondischargeability action" in bankruptcy cases).

Despite this court's exclusive jurisdiction over many types of dischargeability determinations, collateral estoppel, or issue preclusion, applies in nondischargeable debt proceedings.  Grogan v. Garner, 498 U.S. 279, 284 n.11, 111 S. Ct. 654, 658 n. 11 (1991); Bay Area Factors v. Calvert (In re Calvert), 105 F.3d 315, 318 (6th Cir. 1997).  As a result, the bankruptcy court's ultimate dischargeability determination will be governed by any factual issues that were actually and necessarily decided by the state court in rendering its prior judgment.  In re Strozewski, 458 B.R. at 403-04  (citing Spilman v. Harley, 656 F.2d 224, 227-28 (6th Cir. 1981) (The fact that "Congress intended the bankruptcy court to determine the final result [of] dischargeability or not does not require the bankruptcy court to redetermine all the underlying facts."  When the requirements are met, "collateral estoppel should preclude relitigation of factual issues.")) (additional citations omitted).

The present adversary proceeding requires the court to consider both the issue and claim preclusive effect of the prior judgment.  The Trustee, as representative of Kevin's bankruptcy estate, has asserted claims for additional damages for withdrawals that were allegedly made by George in 2011 and 2012 and were not included in the prior

state court judgment.  Therefore, the court must first determine whether the Trustee is permitted to bring these claims for additional damages, or whether the amount of the debt owed by George to Kevin is conclusively established by the res judicata effect of the state court judgment.  This court must then consider whether the state court judgment is entitled to collateral estoppel effect in this adversary proceeding and, if so, whether the judgment debt, or some portion thereof, is nondischargeable based on the determinations made in prior state court litigation.

    C.   <u>The Amount of the Debt and the Res Judicata Effect of the State Court Judgment</u>.

In addition to seeking a determination that the prior judgment debt is excepted from discharge in George's chapter 7 case, the complaint in this adversary proceeding asks this court to find that Kevin is owed an additional debt for withdrawals that occurred from 2011 through 2012.  George has moved for summary judgment on this portion of Kevin's complaint, arguing that res judicata bars Kevin, and now the Trustee as his privy, from seeking damages beyond those awarded in the state court action.  As previously noted, res judicata, or claim preclusion, has limited applicability in nondischargeability proceedings, but applies to determinations regarding the validity, extent, or amount of the debt and precludes the bankruptcy court from revisiting those issues in most instances. <u>See</u> <u>Heckert v. Dotson (In re Heckert)</u>, 272 F.3d 253, 258-59 (4th Cir. 2001) ("Res judicata is applied to prevent the re-litigation of claims, and thus prevent the unsettling of a prior judgment, *whether by increasing or decreasing the award* or by reversing the result . . . . [T]he amount of a state court judgment should not be altered in a bankruptcy dischargeability action.") (emphasis added); <u>Matter of Redburn</u>, 193 B.R. 249, 258 (Bankr. W.D. Mich. 1996).

Because the prior judgment in this case was entered by a Michigan state court, Michigan preclusion law applies. AuSable River Trading Post, LLC v. Dovetail Solutions, Inc., 874 F.3d 271, 274 (6th Cir. 2017). Under Michigan law, res judicata bars a "second, subsequent action" when "(1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first." Id. (citing Adair v. State, 470 Mich. 105, 680 N.W.2d 386, 396 (2004)). Michigan courts apply res judicata "broadly," holding that it bars "not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not." Id. (quoting Adair, 680 N.W.2d at 396).

There is no question that the first two elements of res judicata are satisfied in this proceeding. The prior state court litigation was decided on its merits. Although the previous litigation involved Kevin and George, the Trustee represents Kevin's chapter 7 estate and is pursuing this nondischargeable debt litigation as Kevin's privy. The only question is whether the 2011 and 2012 withdrawals arose as part of the same transaction as the other claims addressed in the state court litigation, and therefore, should have been raised in that context.

"To determine whether a claim could have been brought as part of a prior action, Michigan employs a pragmatic, transactional test." Santos v. Farmers Ins. Exchange, 2007 WL 3333071, *4 (E.D. Mich. Nov. 8, 2007) (unpublished opinion) (citing Adair, 680 N.W.2d at 398). When applying this approach:

> [T]he determinative question is whether the claims in the [second] case arose as part of the same transaction as did the claims in the former case. Whether a factual grouping constitutes a transaction for purposes of res judicata is to be determined pragmatically, by considering whether the facts

19

are related in time, space, origin or motivation, and whether they form a convenient trial unit.

Id. (internal citations to Adair and quotation marks omitted).

In this proceeding, the court finds that the 2011 and 2012 withdrawals arose from the same transaction or occurrence as the other withdrawals that were litigated in the state court. Although these additional withdrawals occurred during a later time period than the other transactions litigated in the state court, the last of the additional withdrawals occurred on March 26, 2012, which was nearly three years prior to the filing of Kevin's Fourth Amended Complaint on January 28, 2015. It was also well before the state court's Opinion on Summary Disposition, entered on June 4, 2015, and the Opinion after Trial, entered on July 16, 2015. Like the prior withdrawals, the 2011 and 2012 withdrawals are alleged to have been made by George from Kevin's IRA account pursuant to the DPOA. Therefore, the claims relating to the new withdrawals are related in "time, space [and] origin" to the withdrawals that were previously litigated in the state court and form "a convenient trial unit" with the prior withdrawals. Although George's answer to the complaint in this adversary proceeding contains only general denials of Kevin's allegations regarding the additional withdrawals, it is logical to assume that his justifications for making the withdrawals will be substantially similar to those asserted in the state court – i.e., that he had permission to use Kevin's money or misunderstood his responsibilities under the DPOA. Accordingly, the "motivations" for the additional withdrawals are likely to be the same, or very similar, to those already addressed by the state court.

The Trustee does not specifically dispute that the additional withdrawals were part of the same transaction as the withdrawals previously litigated. Instead, he argues that

George's "active and fraudulent concealment" of the 2011 and 2012 withdrawals provides an exception to the application of res judicata in this instance.

Michigan law recognizes an exception to res judicata in cases "where the defendant's fraud or misrepresentation prevented the plaintiff from presenting the new ground for relief in the prior action." Santos, 2007 WL 3333071, *4 (quoting Cramer v. Metropolitan Savings Assoc., 337 N.W.2d 264, 267 (Mich. App. 1983)).  This exception is narrowly drawn and applies only to fraud outside the facts of the case "which actually prevents the losing party from having an adversarial trial on a significant issue." Sprague v. Buhagiar, 539 N.W.2d 587, 589 (Mich. App. 1995).  The courts characterize this type of fraud as "extrinsic fraud" which differs from "intrinsic fraud" occurring within the cause of action itself, such as perjury or discovery fraud. Id.  When intrinsic fraud occurs, the remedy is not an independent lawsuit.  Instead, the appropriate "avenue for vitiating such fraud" is to seek relief from judgment under the Michigan Court Rules. See Bachi-Reffitt v. Reffitt, 2017 WL 5998112, *6 (W.D. Mich. Dec. 4, 2017) (unpublished opinion) (citing Daoud v. De Leau, 565 N.W.2d 639 (Mich. 1997); Triplett v. St. Amour, 507 N.W.2d 194 (Mich. 1993)).

In this case, the Trustee somewhat summarily argues that res judicata should not bar him from seeking additional damages because "it is clear that George actively and fraudulently hid the Concealed Withdrawals from both Kevin and the [state] court."  The Trustee has offered no evidence to support his assertion that George concealed the 2011 and 2012 withdrawals and no other evidence on which this court could base a finding of extrinsic fraud.  The state court record supports Kevin's assertion that he was not aware of the 2011 and 2012 withdrawals until some time after the conclusion of the state court

21

trial, but prior to entry of the state court opinion.  But the record also suggests that Kevin's

lack of knowledge was due to discovery issues and other practical obstacles relating to

his incarceration.  The Opinion after Trial specifically stated that Kevin contacted court

staff on July 15, 2015, indicating that he had finally received additional bank records that

he had subpoenaed.  The opinion stated that Kevin had ample time to resolve subpoena

issues prior to trial and noted that he might have benefitted from the assistance of counsel

on these issues.  Kevin's post-judgment motions for a new trial, to re-open discovery, and

to amend his complaint, also reference the "newly found" 2011 and 2012 withdrawals.  In

denying these motions, the state court again noted the difficulties that Kevin had

encountered as a pro se litigant.  The court found, however, that he was not entitled to a

"do-over."[15]

Based on a careful review of the state court record, this court finds no evidence

that George concealed the 2011 and 2012 withdrawals from Kevin in the prior litigation.[16]

---

[15]     In its order, the state court noted that Kevin might have "other options available" for pursuing claims that were not litigated in the trial.  See Order Denying Post-Judgment Motions, at 2.  It cautioned, however, that any such claims could be subject to "principles of res judicata and collateral estoppel."  Id.  It also stated that the order, by itself, was neither a bar to filing a subsequent lawsuit nor permission to do so.  Id. at 3.

Although the issue was not raised by the parties, this court has considered whether the state court's comments implicate the exception to the rule against claim splitting which applies when a court "expressly reserves the plaintiff's right to maintain [a] second action."  See Restatement (Second) of Judgments, § 26(1)(b) (1982).  Given the state court's clear statement that its order was not to be interpreted as granting or denying leave to file a subsequent lawsuit and that any future lawsuit would be subject to general preclusion principles, the order cannot fairly be characterized as "expressly reserving" Kevin's right to file new claims for the 2011 and 2012 withdrawals.

[16]     This fact distinguishes this case from the cases relied upon by the Trustee.  For instance, in Santos v. Farmers Insurance Exchange, the court held that the defendant insurance company affirmatively misled the plaintiffs about the existence of additional insurance coverage and concealed facts that prevented the plaintiffs from bringing their claim in the original lawsuit.  Santos, 2007 WL 3333071 at *5.  By contrast, in the present case, there is no evidence that George affirmatively misled Kevin about the existence of the additional withdrawals or concealed them from Kevin.  Even if George failed to disclose the 2011 and 2012 withdrawals, they were

22

To the extent these additional withdrawals were not disclosed, any fraud that occurred in connection with the nondisclosure was confined to the discovery process and was intrinsic to the litigation.  By filing his post-judgment motions, Kevin sought appropriate remedies for the "newly found" withdrawals.  His requests for relief were denied by the state court.

Kevin had a full and fair opportunity to litigate his claims regarding George's conversion of funds from his IRA account in the state court litigation.  He amended his complaint at least four times.  The state court held four days of trial and issued a seventeen-page opinion.  Kevin's claims for the 2011 and 2012 withdrawals were closely related to the claims that were asserted in the state court and could have been included in the prior litigation.  They were not.  Principles of res judicata preclude Kevin, and the Trustee by extension, from tacking additional damages on to the state court judgment that already addressed the validity and amount of his claim.  George's motion for summary judgment on the counts of the adversary complaint that seek imposition of additional damages for the 2011 and 2012 withdrawals is granted.

D. The Dischargeability of the Judgment Debt and the Collateral Estoppel Effect of the State Court Judgment.

The court must next consider whether all or some of the prior judgment debt should be excepted from discharge in George's chapter 7 case.  Although this court has exclusive jurisdiction to make that dischargeability determination, both parties to this adversary proceeding have acknowledged that the state court judgment is entitled to collateral

---

clearly discoverable from other sources, such as the bank records, and any failure to disclose by George did not prevent Kevin from bringing his claims for the 2011 and 2012 withdrawals during the state court trial.

estoppel, or issue preclusive, effect in this proceeding. See Grogan v. Garner, 498 U.S. 279, 284 n.11, 111 S. Ct. 654, 658 n.11 (1991) (concluding that issue preclusion applies in dischargeability proceedings).

The prior judgment was rendered by a Michigan state court, so "this court must give the judgment the same preclusive effect that any Michigan court would give the judgment." McCurdie v. Strozewski (In re Strozewski), 458 B.R. 397, 404 (Bankr. W.D. Mich. 2011) (citing Migra v. Warren City School District Bd. of Educ., 465 U.S. 75, 81, 104 S. Ct. 892, 896 (1984)) (additional citation omitted). "Under Michigan law, collateral estoppel precludes re-litigation of an issue in a subsequent, different cause of action between the same parties where the prior proceeding resulted in a valid, final judgment and the issue was: (1) actually litigated and (2) necessarily determined." In re Strozewski, 458 B.R. at 404 (citing People v. Gates, 434 Mich. 146, 452 N.W.2d 627, 630 (1990)). Here, there is no dispute that the prior litigation was between the same parties or their privies and that it resulted in a valid, final judgment. As a result, to the extent the state court judgment actually and necessarily decided relevant factual issues, it is entitled to issue preclusive effect in this adversary proceeding. This court will analyze each of the Plaintiff's nondischargeability claims in light of the factual issues that were actually and necessarily determined in the state court.

    1.   *§ 523(a)(4) – Fraud in a Fiduciary Capacity and Embezzlement.*

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The Plaintiff has alleged that the prior judgment debt should be excepted from discharge because it resulted from both embezzlement and defalcation in a fiduciary capacity.

24

*Embezzlement.* "Federal law defines 'embezzlement' under § 523(a)(4) as 'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.'" Brady v. McAllister (In re Brady), 101 F.3d 1165, 1172–73 (6th Cir. 1996) (citations omitted).  A creditor must prove three elements to establish embezzlement: (1) that he entrusted his property to the debtor, (2) that the debtor appropriated the property for a use other than that for which it was entrusted, and (3) that the circumstances indicate fraud.  Id. at 1173 (citing Ball v. McDowell (In re McDowell), 162 B.R. 136, 140 (Bankr. N.D. Ohio 1993)).

"The 'fraud' required under § 523(a)(4) is 'fraud in fact, involving moral turpitude or *intentional* wrong." Cash America Fin. Servs., Inc. v. Fox (In re Fox), 370 B.R. 104, 116 (6th Cir. B.A.P. 2007) (citations omitted) (emphasis in original); see Bullock v. BankChampaign, N.A., 569 U.S. 267, 274-75, 133 S. Ct. 1754, 1760 (2013) ("embezzlement requires a showing of wrongful intent") (citing Neal v. Clark, 95 U.S. 704, 709, 24 L. Ed 586 (1878)).  The requisite fraudulent intent may be established by circumstantial evidence.  In re Fox, 370 B.R. at 116 (citing WebMD Servs., Inc. v. Sedlacek (In re Sedlacek), 327 B.R. 872, 880-81 (Bankr. E.D. Tenn. 2005)).  Misrepresentations, omissions, or concealment of actions are circumstances which might "illuminate a debtor's fraudulent intent." Id. at 117 (citations omitted).  To the contrary, evidence that the debtor "used the creditor's property openly, without attempting to conceal, and had reasonable grounds to believe he had the right to so use" might suggest that the debtor lacked fraudulent intent.  Id. (citing In re Weber, 892 F.2d 534, 539 (7th Cir. 1989)).

In its Opinion after Trial, the state court analyzed Kevin's "embezzlement" allegations in the context of his statutory conversion claim.  Unlike embezzlement under § 523(a)(4), a finding of statutory conversion under Michigan law does not require a showing of wrongful intent.  The Michigan conversion statute provides, in relevant part, that:

> (1) A person damaged as a result of . . . the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> (a)   Another person's stealing or embezzling property or converting property to the other person's own use.

Mich. Comp. Laws § 600.2919a.  Because the Michigan conversion statute does not define the words "embezzling" or "converting" and does not identify the requisite elements for such claims, those are supplied by reference to other aspects of Michigan law.  See Dantone v. Dantone (In re Dantone), 477 B.R. 28, 38 (6th Cir. B.A.P. 2012) (discussing conversion) (citations omitted).

In Michigan, common law conversion "consists of any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein."  Department of Agriculture v. Appletree Marketing, LLC, 779 N.W.2d 237, 244 (Mich. 2010) (citation and internal quotation marks omitted).  "No intent to violate the property rights of another, or knowledge that another's property rights are being violated, is required."  In re Dantone, 477 B.R. at 38.  By contrast, embezzlement under Michigan law typically requires an "intent to defraud or cheat" the rightful owner of his or her interest in property.[17]  People v. Lueth, 660 N.W.2d 322, 332 (Mich. App. 2002) (identifying six

---

[17]   The Michigan Court of Appeals recently explained that prior to the enactment of the conversion statute, embezzlement was a statutory offense under Mich. Comp. Laws § 750.174(1) and was "not an offense at common law."  See Cabala v. Allen, 2012 WL 4465164, *2 (Mich. App.

elements that must be proven to establish a cause of action for embezzlement by an agent) (citations omitted).

In rendering its finding of fact and conclusions of law on Kevin's statutory conversion claims, the state court did not distinguish between findings of "embezzlement," which would have necessarily required an intent to deceive, and determinations of "conversion," which would not.  However, when a cause of action "can be established by more than one standard under state law, a factual finding in the state courts meeting the federal standard will support collateral estoppel for bankruptcy purposes."  Charron v. Morris, 288 F. Supp. 3d 810, 820 (W.D. Mich. 2017) (citations omitted), aff'd, No. 18-1117 (6th Cir. Oct. 26, 2018) (unpublished order).  As a result, this court will examine the specific findings made by the state court to determine whether they establish the standard for embezzlement under § 523(a)(4).

With regard to the vast majority of the withdrawals that form the basis of the state court judgment, the findings in the Opinion after Trial do not support the conclusion that George was acting with actual, wrongful intent to deprive his father of the IRA funds.  The state court found that Kevin gave George permission to borrow money and provided "ambiguous" instructions about how to manage the IRA account and other items covered by the DPOA.  It also found that George was entitled to recover $15,000 from Kevin, to compensate for his work on the Third Street house and based on Kevin's promises prior to the Judgment of Divorce and in the judgment itself.  In light of these facts, the court opined that George's conversion of the IRA funds may have come from a "fundamental

---

Sept. 27, 2012) (unpublished).  Although the Michigan embezzlement statute arguably included only criminal remedies, the "plain language of MCL 600.2919a(1)(a)" now provides a "method of recovery for a civil claim of embezzlement."  Id.

misunderstanding" of what he was allowed to do pursuant to the DPOA or perhaps, from his willingness to "gamble" that his father would not respond as he did when he learned of the withdrawals.  Neither of these potential explanations is consistent with a finding that George made the withdrawals with a knowing and wrongful intent to deprive his father of the IRA funds.

The single exception in the state court's opinion are its specific factual findings with regard to the $14,500 George admitted to "borrowing" from Kevin.  Based on written statements in George's August 2012 letter about this transaction, the court held that George "took the money, knew it was wrong, and promised to make it right."  The state court also found that George's unauthorized conversion of these funds was entirely unrelated to his belief that Kevin owed him $15,000 under the judgment of divorce or was obligated to reimburse him for amounts spent on the Third Street property.[18]  These findings establish that that George knowingly, intentionally, and fraudulently converted or embezzled the $14,500 from Kevin, which also constitutes embezzlement under § 523(a)(4).

The state court held a four-day bench trial on Kevin's claims and issued a detailed opinion after conclusion of that trial.  No purpose would be served by revisiting the issues addressed by the state court in the context of this nondischargeability proceeding.  A careful review of the state court's findings reveals that George acted with wrongful intent when he embezzled or converted the $14,500 from his father's IRA account.  This amount, and the pro rata share of the derivative damages that are attributable to it, is

---

[18]     This specific finding forecloses any argument that the $14,500 should be offset against the $15,000 that the court held George was entitled to recover from Kevin.

excepted from discharge because it resulted from embezzlement under § 523(a)(4).[19] The Plaintiff is entitled to summary judgment as to this amount.  With regard to the other withdrawals addressed in the state court opinion and judgment, the state court's findings compel the conclusion that George was not acting with the requisite intent to deprive Kevin of his property.  Accordingly, the debt for these amounts is not excepted from George's discharge as a debt for embezzlement under § 523(a)(4) and George is entitled to summary judgment on this count.

*Fraud or Defalcation in a Fiduciary Capacity*.  A finding of "fraud or defalcation while acting in a fiduciary capacity" under § 523(a)(4) requires the following: "(1) a pre-existing fiduciary relationship, (2) a breach of that relationship, and (3) resulting loss." Patel v. Shamrock Floorcovering Servs., Inc. (In re Patel), 565 F.3d 963, 968 (6th Cir. 2009) (citing Bd. of Trustees of the Ohio Carpenters Pension Fund v. Bucci (In re Bucci), 493 F.3d 635, 642 (6th Cir. 2007)).  The Supreme Court has recently held that defalcation in a fiduciary capacity requires mental culpability as well, which it described as a state of mind "involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."  Bullock v. BankChampaign, N.A., 569 U.S. 267, 269, 133 S. Ct. 1754, 1757 (2013).

---

[19]    The $14,500 that George intentionally converted and embezzled from Kevin constitutes approximately 37.958% of the $38,200 in total compensatory damages awarded by the state court.  The state court also awarded $26,612.52 in transportation costs, attorney's fees, other fees, and statutory interest.  Of this amount, $10,101.58 was attributable to the $14,500 George intentionally and wrongfully embezzled.  Accordingly, the total portion of the prior judgment debt that is nondischargeable in this adversary proceeding is $24,601.58.  See Cohen v. de la Cruz, 523 U.S. 213, 220-21, 118 S. Ct. 1212, 1217 (1998) (construing the phrase "debt for" in § 523(a)(2)(A) as including all liability that arises out of the debtor's fraud and noting that the term has the "equivalent meaning" in other subsections of § 523(a)).

In this case, a threshold issue regarding the Plaintiff's fraud or defalcation claim is whether the DPOA created a fiduciary relationship between George and Kevin for purposes of § 523(a)(4). The Sixth Circuit Court of Appeals defines the term "fiduciary capacity" in § 523(a)(4) more narrowly than the phrase is construed in other circumstances. Shafer Redi-Mix, Inc. v. Craft, 414 B.R. 165, 171 (W.D. Mich. 2009) (citing In re Bucci, 493 F.3d at 639). Under § 523(a)(4), the requisite fiduciary obligations occur "only [in] situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." Id. (quoting In re Bucci, 493 F.3d at 639-40 (explaining that an express trust requires: "(1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary")). "Although the existence of a fiduciary relationship under § 523(a)(4) is governed by federal law, courts look to state law to determine whether an express or technical trust has been created." First American Title Ins. Co. v. Gaskill (In re Gaskill), 480 B.R. 291, 299 (Bankr. W.D. Mich. 2012) (citing Commonwealth Land Title Co. v. Blaszak (In re Blaszak), 397 F.3d 386, 390-91 (6th Cir. 2005); Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.), 760 F.2d 121, 124 (6th Cir. 1985)). Under Michigan law, the requirements for creation of an express trust are: "(1) the existence of a clearly defined res; (2) an unambiguous trust relationship; and (3) special affirmative duties undertaken by the trustee." Kitchen v. Boyd (In re Newpower), 229 B.R. 691, 705 (W.D. Mich. 1999) (citation omitted), aff'd in part and reversed in part on other grounds, 233 F.3d 922 (6th Cir. 2000).

Michigan courts generally hold that an "attorney in fact acting under the authority of a general power of attorney is in a fiduciary relationship with the principal." In re Susser Estate, 657 N.W.2d 147, 150 (Mich. App. 2002). The Michigan Court of Appeals has

30

noted that this conclusion is consistent with the "well established" idea "that powers of attorney are to be construed in accordance with the principles governing the law of agency." Id. (quoting VanderWall v. Midkiff, 421 N.W.2d 263, 267 (Mich. App. 1988)).

The Sixth Circuit has previously held that the existence of a state law "agent-principal relationship standing alone is insufficient to establish the type of fiduciary duty contemplated by § 523." In re Blaszak, 397 F.3d at 391 (citing In re Interstate Agency, 760 F.2d at 125); see also R.E. America, Inc. v. Garver (In re Garver), 116 F.3d 176, 179 (6th Cir. 1997) (holding that an "attorney-client relationship, without more, is insufficient to establish the necessary fiduciary relationship" element of § 523(a)(4)). Accordingly, despite the fact that a durable power of attorney may create a general fiduciary relationship under state law, this relationship will only rise to the level required by § 523(a)(4) when the DPOA establishes an express trust. See Bast v. Johnson (In re Johnson), 174 B.R. 537, 541 (Bankr. W.D. Mo. 1994) ("As a rule, the general fiduciary duty created by a power of attorney gives rise to an agency relationship, but does not give rise to the fiduciary capacity required by § 523(a)(4)."); cf. In re Blaszak, 397 F.3d at 391-92 (finding that the terms of an agency agreement established the elements of a technical or express trust because it provided for segregation of funds and remission of those funds to the creditor on a regular basis and named the debtor as trustee and the creditor as beneficiary)); Robinson v. Robinson (In re Robinson), 2012 WL 4715093, *5 (Bankr. N.D. Ohio Oct. 1, 2012) (unpublished opinion) (although the "execution of a power of attorney does not alone create the fiduciary relationship required under § 523(a)(4),"

31

such a relationship may exist if the language of the power of attorney establishes an intent to create an express trust).[20]

Regardless of whether the DPOA in this case is analyzed under federal or Michigan law, it does not have any language or characteristics suggesting it was intended to establish an express trust. The DPOA gives George broad power to act as Kevin's agent, but does not identify any specific property that would serve as a trust res. It also requires that George act for Kevin's "use and benefit," but it imposes no other fiduciary duties. It does not refer to George as a trustee and does not specifically identify Kevin as a beneficiary. Accordingly, this court holds that the execution of the DPOA did not create the fiduciary relationship required under § 523(a)(4). George is entitled to summary judgment on this portion of the Plaintiff's claim.[21]

---

[20]    In his supplemental briefs, the Trustee cites three cases from outside of the Sixth Circuit for the proposition that "[a] power of attorney can create a fiduciary relationship for purposes of § 523(a)(4)." See Richardson v. Mills (In re Mills), 555 B.R. 106 (Bankr. D. Mass. 2016); Estate of McCaffery v. McCaffery (In re McCaffery), 2016 WL 7241377 (Bankr. D.N.J. Dec. 13, 2016); Hubanks v. Jouett (In re Jouett), 512 B.R. 277 (Bankr. N.D. Okla. 2014). The Trustee argues that, under these cases, the proper test for determining whether a power of attorney creates a fiduciary relationship for purposes of § 523(a)(4) is "whether there was a power imbalance between the parties or whether the principal had an ability to monitor the attorney-in-fact." In re McCaffery, 2016 WL 7241377, *2.

The court notes that there is a split of authority on the nature of the fiduciary relationship required under § 523(a)(4). In re Garver, 116 F.3d at 178-79 (noting that the federal courts "often differ" on this issue and adopting a narrow construction). The cases cited by the Trustee were generally decided in accordance with authority from jurisdictions that take a broader view of the type of fiduciary relationship required under § 523(a)(4) and are not in accordance with the Sixth Circuit's express trust requirement. See, e.g., In re Mills, 555 B.R. at 131 (citing In re Marchiando, 13 F.3d 1111, 1116 (7th Cir. 1994)); cf. In re Jouett, 512 B.R. at 292-93 (identifying the state law fiduciary duties created under a durable power of attorney, but not addressing the federal standard under § 523(a)(4)). Even if the court were to apply the test suggested by the Trustee, the present case did not involve a power imbalance or inability to monitor. Despite Kevin's incarceration, he was corresponding with George throughout the relevant time periods. He was also able to monitor George's activities, as evidenced by the fact that he prevailed in the state court litigation.

[21]    Even if the court were to conclude that the DPOA established a fiduciary relationship for purposes of § 523(a)(4), the Plaintiff's fraud or defalcation claims would be subject to the same state of mind requirements as his embezzlement cause of action. Bullock, 569 U.S. at 269, 133

2. *§ 523(a)(6) – Willful and Malicious Injury.*

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6). Willfulness under § 523(a)(6) requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."  Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S. Ct. 974, 977 (1998) (emphasis in original).  Thus, a willful injury is one where the debtor "'desires to cause [the] consequences of his act, or . . . *believes that the consequences are substantially certain to result from it*.'"  Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 464 (6th Cir. 1999) (quoting Restatement (Second) of Torts § 8A, at 15 (1964)) (emphasis added).  An injury is "malicious" under § 523(a)(6) when a debtor acts "in conscious disregard of [his] duties or without just cause or excuse; it does not require ill-will or specific intent to do harm."  Wheeler v. Laudani, 783 F.2d 610, 615 (6th Cir. 1986); Monsanto Co. v. Trantham (In re Trantham), 304 B.R. 298, 308 (6th Cir. B.A.P. 2004).  The statute requires that the alleged injury be both willful and malicious for the debt to be nondischargeable.  In re Markowitz, 190 F.3d at 463.

As with the embezzlement claim under § 523(a)(4), the state court's findings in its Opinion after Trial establish that George's withdrawal of $14,500 from Kevin's IRA account constituted a willful and malicious act.  The court found that George took these funds from Kevin's IRA account and knew it was wrong.  This action was willful because George knew (and admitted) that Kevin was substantially certain to be harmed by this unauthorized withdrawal.  It was also malicious, because the only reason George gave

---

S. Ct. at 1757.  Based on the state court's findings, this court would likely conclude that George had the requisite intent to defraud Kevin with regard to the $14,500, but that he lacked fraudulent intent as to the balance of the withdrawals.

for the withdrawal – i.e., that he was under financial stress at the time – does not constitute just cause or excuse for converting his father's IRA funds.

The state court's findings similarly establish that the balance of the withdrawals were not made with willful or malicious intent.  The state court made no findings that George acted with the intent to injure Kevin when making the withdrawals.  By contrast, it did find that Kevin's ambiguous instructions and George's subjective beliefs about his entitlement to the funds, or some portion thereof, contributed to George's decision to make the withdrawals.  Accordingly, this court cannot conclude that George made the majority of the withdrawals "without just cause or excuse."

The Plaintiff is entitled to summary judgment as to the $14,500, and the pro rata derivative damages relating thereto, under § 523(a)(6).  The Plaintiff's motion for summary judgment seeking a determination that the balance of the judgment damages are excepted from discharge under § 523(a)(6) will be denied and George's cross motion will be granted.

3.  *Unclean Hands Doctrine.*

Finally, the Defendant argues that the Plaintiff's nondischargeable debt causes of action are barred in their entirety due to Kevin's "unclean hands."  Kevin continues to be incarcerated by the Michigan Department of Corrections for crimes unrelated to his claims against George.  The Sixth Circuit has held that the unclean hands doctrine may be employed by a court to deny injunctive or other equitable relief "where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party."  Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1383 (6th Cir. 1995) (citation omitted).  The

doctrine "requires that the alleged misconduct on the part of the plaintiff relate directly to the transaction about which the plaintiff has made a complaint." Id. (citation omitted). It is not intended "to be used as a loose cannon" whenever a plaintiff is guilty of unrelated misconduct, but instead applies "only where some unconscionable act" of the individual seeking relief has an "immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." Id. (citations omitted).

At least one circuit court of appeals, the Fourth Circuit, has held that the doctrine of unclean hands may preclude relief under § 523. Republic of Rwanda v. Uwimana (In re Uwimana), 274 F.3d 806 (4th Cir. 2001), abrogated by Bullock v. BankChampaign, N.A., 569 U.S. 267, 133 S. Ct. 1754 (2013). Other opinions, including one authored by another bankruptcy judge in this district have expressed "qualms about applying the unclean hands doctrine in dischargeability litigation because the relief that a plaintiff requests under 11 U.S.C. § 523 is statutory, not simply equitable." Bello Paradiso, LLC v. Hatch (In re Hatch), 465 B.R. 479, 494 (Bankr. W.D. Mich. 2012) (Dales, C.J.).

In this case, the court need not decide the broad issue of whether the unclean hands doctrine can ever bar a nondischargeable debt cause of action under § 523 because Kevin's alleged misconduct does not bear an immediate and direct relationship to the wrongdoing asserted in his nondischargeability complaint. Like the state court, this court holds that the crimes for which Kevin is currently incarcerated are entirely irrelevant to the claims in this adversary proceeding. The Defendant's more specific allegation that Kevin did not disclose the funds in his IRA account to the State of Michigan to avoid paying the costs of his incarceration is somewhat more relevant, but also lacks the direct connection required to invoke the unclean hands doctrine. Even if Kevin acted with the

intent to defraud the State of Michigan, those actions do not directly relate to the wrongdoing asserted in Kevin's nondischargeable debt complaint, all of which pertain to George's conversion of the funds in the IRA account.

Accordingly, George's motion for summary judgment based on the doctrine of unclean hands is denied.

## V.  CONCLUSION.

For the reasons stated herein, this court holds that the prior state court judgment conclusively established the existence, validity and amount of Kevin's claim against George for withdrawals made pursuant to the DPOA.  To the extent the complaint in this adversary proceeding seeks to recover amounts beyond those included in the prior state court judgment, those claims are barred by res judicata.  George's motion for summary judgment on those counts is granted and those counts of the complaint are dismissed.[22]

Based on the collateral estoppel effect of the findings in the prior state court judgment, this court further concludes that $14,500 of the compensatory damages awarded by the state resulted from George's intentional and fraudulent conversion or embezzlement of the funds in Kevin's IRA.  This portion of the judgment debt, and the pro rata damages attributable to it, is nondischargeable as a debt for embezzlement under § 523(a)(4) and for willful and malicious injury under § 523(a)(6).  The Plaintiff's motion for summary judgment on these portions of the complaint is granted and the court will enter a nondischargeable judgment for the total amount of $24,601.58.

---

[22]  This includes the counts of the complaint identified in paragraphs 3 and 4 of the Issues section of the First Pretrial Order.  (AP Dkt. No. 77.)

36

The state court's factual findings regarding the balance of the damages awarded under the prior judgment establish that those portions of the judgment debt did not result from embezzlement or fraud or defalcation in a fiduciary capacity under § 523(a)(4), or willful and malicious injury under § 523(a)(6).   The Defendant's motion for summary judgment on these counts is granted.   A separate order shall be entered accordingly.

**IT IS SO ORDERED.**

**Dated December 4, 2018**



James W. Boyd
United States Bankruptcy Judge